Kevin Mahoney (SBN: 235367)
kmahoney@mahoney-law.net
Katherine J. Odenbreit (SBN: 184619)
kodenbreit@mahoney-law.net
**MAHONEY LAW GROUP, APC**
249 East Ocean Blvd., Suite 814
Long Beach, CA  90802
Telephone: (562) 590-5550
Facsimile: (562) 590-8400

Lisa L. Clay (*Pro Hac Vice Pending*)
lclayaal@gmail.com
Lisa L. Clay, Attorney at Law
345 North Canal Street, Suite C202
Chicago, IL 60606
Telephone: (312)753-5302

Attorneys for Plaintiff DONEYDA PEREZ as an individual and on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| DONEYDA PEREZ as an individual and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>      v.<br><br>DIRECTV GROUP HOLDINGS, LLC, a Delaware Corporation, LONSTEIN LAW OFFICES, P.C., a New York Professional Corporation; SIGNAL AUDITING, INC., a New York Corporation, JULIE COHEN LONSTEIN and WAYNE M. LONSTEIN,<br><br>              Defendants. | Case No.: 8:16-CV-01440-JLS-DFM<br><br>Assigned for All Purposes to:<br>Hon. Josephine L. Staton; Dept. 10A<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**<br><br>Complaint Filed:    August 4, 2014<br>Trial Date:         None Yet Set<br><br>**REQUEST FOR JURY TRIAL** |

- 1 -

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff DONEYDA PEREZ (hereinafter "Ms. Perez" or "Plaintiff") on behalf of herself and all others similarly situated, complain and alleges as follows:

## NATURE OF THE CASE

1.     This is a putative class action brought on behalf of Plaintiff Doneyda Perez and all others similarly situated arising from the scheme to defraud and extort purported "settlements" from innocent consumers threatened with sham litigation resulting from entrapment (hereinafter the "Scheme") perpetrated by Defendants DIRECTV GROUP HOLDINGS, LLC ("DirecTV"), LONSTEIN LAW OFFICES, P.C. ("LLO"), SIGNAL AUDITING, INC. ("Signal Auditing") and JULIE COHEN LONSTEIN ("J. Lonstein") and WAYNE M. LONSTEIN ("M. Lonstein") (hereinafter collectively referred to as "Defendants").

2.     Defendants have, and continue to engage in a scheme and course of conduct in which the owners of small businesses in the State of California (often minorities based upon their race, ethnicity and/or national-origin) are the focus of unsolicited sales campaigns to sell satellite cable television services provided by Defendants for use in their small businesses.  When a small business owner purchases DirecTV services, they are often unwittingly provided with residential services even when they specifically request a commercial account. DirecTV and/or its agents do not provide the business owners with any written contracts, agreements, notices or other documents regarding the satellite cable television services which they have purchased, in part to hide the fraudulent nature of the service.

3.     Despite DirecTV having been the subject of a nationwide investigation into questionable marketing and sales tactics, resulting in a consent decree with 48 Attorneys General, these practices continue to this day.

4.     The business owners do not solicit, request or direct that the satellite cable television services which they have purchased be provided under a residential account; rather, they rely upon Defendant DirecTV to provide the satellite cable television services which they have purchased for their business under the proper

FIRST AMENDED CLASS ACTION COMPLAINT

1    type of commercial accounts.

2        5.    Without the business owners being made aware, DirecTV designates

3    the accounts as "residential," despite the fact that DirecTV and/or its agents solicit

4    small business owners like Ms. Perez and those similarly situated in their business

5    establishments, for business services.

6        6.    The Defendants' scheme is engendered by the Communications Act,

7    which provides for terrifyingly-high looking statutory damages awards and the

8    provision for an award of attorneys' fees to the prevailing plaintiff, with no mutual

9    provision for the innocent defendant who succeeds in defending him/herself. The

10   Communication Act is therefore rife for abuse by these and other plaintiffs. Indeed,

11   the Scheme Defendants have made very lucrative business models from abuse of

12   this statute.

13       7.    The Scheme works as follows: after the satellite cable television

14   services have been installed by DirecTV or its agents, and the owners have used

15   those services in their businesses, Defendants perpetrate the Scheme using interstate

16   wire and mails threatening sham litigation as follows:

17           a. DirecTV provides to Signal Auditing and Signal Auditing's CEO J.

18              Lonstein information regarding which businesses to target;

19           b. Signal Auditing, overseen by J. Lonstein and W. Lonstein, "hires"

20              contract "investigators" from their own company, Signal Auditing,

21              to gather "evidence" of the purported commercial use of a

22              residential account, by sending the "investigators" to the businesses

23              where the Signal Auditing agent clandestinely obtain photographs

24              and/or video recordings which purport to show that the businesses

25              are using the residential satellite cable television services in a

26              commercial establishment;

27           c. The investigator then provides Signal Auditing/LLO "evidence" on

28              a form affidavit drafted by Signal Auditing and/or LLO.  Payment

FIRST AMENDED CLASS ACTION COMPLAINT

is made only if the investigator provides a "hit" – i.e. their signature on the form affidavit;

d.  LLO then launches a campaign of telephone calls and threatening, intentionally vague, and exaggerated demand letters to innocent consumers. These business owners are told they have "defrauded" DirecTV, "owe" DirecTV tens of thousands of dollars and threatening to ruin their credit and lawsuits.  These threatened actions are a sham because (1) DirecTV installed the residential services at a business and knows the programming is being shown at the business; (2) Signal Auditing LLO and the Lonsteins know this; Signal Auditing, LLO and the Lonsteins make misrepresentations of fact and law in their threatening communication with these victims; (3) LLO and the Lonsteins have no intention of actually filing litigation, but will threaten to do so for tactical purposes, to instill fear and increase the Scheme proceeds;

e.  The sole purpose of LLO and Lonsteins' calls and demand letters is to frighten innocent consumers into paying settlement demands that are made solely for the purpose of extorting a sum of money the innocent victim will believe is a better outcome than having to defend the litigation or repair their credit;

f.  During some point in the threatening calls and letters, the business owner is offered a "choice" to either pay a lump sum of money (usually communicated at $50,000 or more) or pay a lower lump sum and sign up for DirecTV business services, at a higher monthly rate;

g.  Upon information and belief, DirecTV does not pay for these audits and no conspirator in the Scheme is paid, other than the Signal

FIRST AMENDED CLASS ACTION COMPLAINT

Auditing "investigator," unless a "settlement" is paid by the business owner/victim;

h. In the rare case that a lawsuit is actually filed against those business owners who refuse to pay, that litigation is a sham because the claim is based on the known false premise the business owner has had unauthorized access to DirecTV services, among other false misrepresentations of fact and law as identified herein.

8.    Signal Auditing's involvement in the Scheme is to provide these "agents" to Defendants Law Office and Lonstein for purposes of entrapping unsuspecting victims. Signal Auditing agents are directed and controlled by LLO and Lonstein.

9.    Utilization of Defendant Signal Auditing allows the enterprise to function more effectively given that "audits" would typically be performed by an uninterested third party with no financial stake in the discovery of an alleged pirated signal. Defendant Signal Auditing advertises to those who use its service a 4-step process to complete the audit which includes: Identifying the offender, allowing the offender to pay a fee (through LLO and Lonstein), covert the offender to a subscribing "good faith" customer (converting to a DirectTV commercial account) and prosecuting nonpaying "offenders".[1]  This outline actually describes the Scheme in part and shows how all of the Defendants are intertwined and crucial to perpetuating the Scheme.

10.    Defendants do not confine themselves to minority small business owners, however they target minority small business owners with the belief that such owners are less likely to dispute or challenge the allegations.

11.    Thus, in addition to the monthly fees already paid by the small businesses for the satellite cable television services, Defendants have obtained

---

[1] http://www.signalauditing.com/piracy-solutions

FIRST AMENDED CLASS ACTION COMPLAINT

thousands, if not millions of dollars in Scheme proceeds paid to Defendants as "settlements," by the small business owners who have been their victims.

12. Due to their course of conduct, Defendants have violated California Business and Professions Code § 17200 ("Unfair Competition Law" or "UCL") and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

13. Ms. Perez therefore seeks declaratory, injunctive and monetary damages under the UCL and RICO, on behalf of herself and all others similarly situated within the State of California.

## THE PARTIES

14. Plaintiff Doneyda Perez is an individual residing in Anaheim, California. Ms. Perez is the sole owner of Oneida's Beauty and Barber Salon, a beauty salon located at 12342 Harbor Boulevard, Garden Grove, California 92840.

15. Defendant DirecTV Group Holdings, LLC ("DirecTV") is a limited liability company organized under the laws of the State of Delaware, which operates nationwide and maintains its principal executive offices in El Segundo, California. At all times relevant hereto, Defendant DirecTV was and is engaged in the business of acquiring, promoting, selling and distributing digital entertainment (*i.e.*, broadcast and premium television programming) primarily through satellite transmission to residential and commercial subscribers.

16. Defendant Lonstein Law Office, P.C. ("Defendant LLO") is a professional corporation organized under the laws of the State of New York. At all times relevant hereto, the Lonstein Law Office, P.C. was and is a law firm retained by DirecTV to, *inter* alia, prosecute alleged thefts by small businesses in California of the satellite cable television services of DirecTV.

17. Defendant Julie Cohen Lonstein ("Defendant Lonstein") is an individual who is licensed to practice law in the State of New York, and is a partner with the Lonstein Law Office, P.C. She is not admitted to practice law in the State of California. At all times relevant hereto, Defendant Lonstein is, and was, Lead

Counsel for Defendant Signal Auditing and listed as "co-inventor" on the patent for the device used by Defendant Signal Auditing to detect the alleged signal piracy.[2]

18.   Defendant Signal Auditing, Inc. is a corporation organized under the laws of the State of New York and maintains its principal executive offices in Ulster, New York. The address listed for Defendant Signal Auditing, Inc. is the same address as Defendant Lonstein Law Office. At all times relevant hereto, Signal Auditing was and is engaged in the business of nationwide auditing of commercial and residential piracy of telecommunication subscribers, as overseen by Defendant Lonstein.

19.   Defendant Wayne Lonstein ("Defendant W. Lonstein") is an individual who is licensed to practice law in the State of New Jersey, Pennsylvania, and Massachusetts.  At all times relevant hereto, Defendant W. Lonstein is and was lead counsel for Defendant Signal Auditing and listed as "co-inventor" on the patent for the device used by Defendant Signal Auditing to detect the alleged signal piracy. Defendant W. Lonstein is also an attorney for Defendant LLO listed on its letterhead.

## JURISDICTION AND VENUE

20.   This action arises under the laws of the United States.  This Court has original jurisdiction over the subject matter of this action pursuant to both U.S.C. § 1964, which entitles the Court to hear claims brought under 18 U.S.C. § 1962, and also pursuant to 28 U.S.C. § 1331, which gives the court jurisdiction over actions that arise under the laws of the United States. This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 over other claims so related to federal claims that they form part of the same case or controversy.

21.   This Court has personal jurisdiction over Defendants because they have significant minimum contacts with this State, and intentionally availed themselves

---

[2] Upon information and belief, the only "device" being used by Signal Auditing agents to detect the signal piracy alleged herein is the eyes and ears of the purported investigators.

of the laws of California by transacting a substantial amount of business throughout the State and this District, including but not limited to, the promotion, marketing, advertising, and sale of cable television services by DirecTV throughout the Central District of California, Southern Division.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(b).  Plaintiff resides in the Central District of California, Southern Division, and Defendants are located in and do business in, the Central District of California, Southern Division. All of the events that are the subject of this Complaint took place in the Central District of California, Southern Division.

## RICO FACTUAL ALLEGATIONS

23.     Defendant J. Lonstein has never been licensed to practice law in the State of California.

24.     Defendant W. Lonstein has never been licensed to practice law in the State of California.

25.     DirecTV maintained authorized sales representatives in California instructed by DirecTV to solicit small businesses and install DirecTV equipment and services.

26.     Defendant Signal Auditing conducts satellite transmission audits nationwide and in the State of California and on behalf of DirecTV and/or LLO, J. Lonstein and W. Lonstein.  J. Lonstein and W. Lonstein act as Corporate Counsel for Defendant Signal Auditing.

27.     At all times relevant hereto, Defendants J. Lonstein, W. Lonstein, Signal Auditing, and LLO acted for, or on behalf of, DirecTV in undertaking the acts and/or omissions alleged herein.

28.     The "Scheme" begins with DirectTV representatives targeting and soliciting small, primarily minority-owned businesses to purchase DirectTV satellite cable services at a "special rate."   After the business owner agrees to purchase

FIRST AMENDED CLASS ACTION COMPLAINT

DirectTV services, the equipment is immediately installed at their place of business. DirectTV then internally designates the account as "residential."

29.     DirectTV then provides information to Defendant Signal Auditing and W. Lonstein who then send auditors to these businesses for a "signal audit."  An "investigator" for Defendant Signal Auditing then determines the business owners are allegedly using DirecTV residential services for commercial use in their businesses.  Defendants LLO, J. Lonstein, and W. Lonstein train Defendant Signal auditors what to look for to conclude the services are "pirated."  Auditors are only paid if they find alleged misuse.

30.     Based on this information, provided by Defendant Signal Auditing and W. Lonstein, DirectTV, through Scheme participants/agents LLO and Lonstein, Defendants, initiates telephone calls and letters sent through the U.S. Mail and Wire to threaten theses small business owners with credit reporting, "owed" debts, and sham litigation unless they pay outrageous sums of money.  Through LLO and Lonstein, business owners are offered three choices: (1) pay a high flat rate ($25,000-$100,000 or more) and be "done with the matter"; (2) pay an amount a few thousand less and sign up for a DirectTV commercial account paying a higher monthly rate on a continuous basis, or (3) be sued in federal court.  When a business owner refuses to choose, Defendants Lonstein and LLO lower the amount and continue the barrage of calls until the business owner relents.

31.     Plaintiff is informed and believes LLO and Lonstein rarely, if ever, follow through with actual litigation because the threat of litigation is a sham to secure payment from the business owners.

32.     Those customers who did/do pay were/are required to sign an agreement to transmit electronically (wire), either directly, through an online payment service, or a direct debit from their bank account to Defendant LLO.  This Scheme is premised on fraudulent misrepresentations of fact by Defendant DirectTV to the business owner that they are signing up for an account for their business which

DirecTV later contends is categorized by it as a residential account unbeknownst to the business owner.  The Scheme continues with Defendant Signal Auditing's "audit" of the business and the "determination" that the business is unlawfully broadcasting DirecTV programming in a commercial establishment. That information is then passed onto DirecTV, LLO and Lonstein.

33.     Finally, LLO and Lonstein on behalf of DirecTV, make repeated factual and legal misrepresentations to the business owners in telephone calls and letters sent via U.S. Mail, falsely claiming that the business owners/victims have violated "state and federal law" and "owe" DirecTV and LLO money.

34.     The Scheme provides lucrative proceeds for the Scheme Defendants. The result of the activities of the Scheme provides substantial additional money and/or increased revenue for Scheme Defendant DirecTV from accounts converted to commercial at commercial rates; thousands if not millions of dollars in "settlement" amounts; fees paid to Defendant Signal Auditing for "discovering" the "piracy;" and substantial legal fees for Defendants J. Lonstein, W. Lonstein and LLO in the form of their "cut" of the "settlement" amounts.

35.     This conduct occurred consistently throughout the United States from at least four years preceding the filing of the Complaint in this matter and continues to occur.  Complaints by business owners from around the country establish the continuous nature of the enterprise.  Plaintiff is informed and believes the Lonstein Defendants and DirecTV have collected millions of dollars from this Scheme. In 2015 Defendants LLO and Lonstein admitted via declaration submitted by Julie Cohen Lonstein that she, Defendant W. Lonstein and their firm sent over 400 letters similar to the ones sent to Plaintiff in this case in New Jersey alone during a six-year period to DirecTV subscribers similarly situated to Plaintiff.  Therefore, the Scheme has been continuous and perpetuated by Defendants for many years and Plaintiff is informed and believes it is continuing to date.

36.     Defendants were knowingly and willing participants in the Scheme, and reaped revenues and/or profits therefrom.

37.     Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, Defendants acting collectively engaged in activity constituting a violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud), the predicate acts. The racketeering activity was made possible by the regular and repeated use of the services and distribution channels of Defendant DirecTV, the auditing services of Defendants Signal Auditing and W. Lonstein and the legal services of Defendants Lonstein and LLO.

38.     Defendants DirecTV, Lonstein, W. Lonstein, Signal Auditing and LLO committed multiple "Racketeering Acts," as described herein, including aiding and abetting such acts.

39.     The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.

40.     In devising and executing the Scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343, in that they devised and knowingly carried out a material scheme or artifice to defraud or to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the Scheme, Defendants committed these Racketeering Acts, intentionally and knowingly, with the specific intent to advance the Scheme.

41.     Other methods and means that Defendant DirecTV used to execute and perpetrate the Scheme include, but are not limited to, providing subscriber information to Defendants LLO, Lonstein, W. Lonstein and/or Signal Auditing for the purpose of initiating an audit of targeted subscribers; utilizing agents to solicit small businesses for DirecTV services who misrepresent that the small business

FIRST AMENDED CLASS ACTION COMPLAINT

subscribers are obtaining a commercial account when they are designated by DirectTV as "residential subscribers;" and receiving collected funds electronically from Defendants Lonstein and/or LLO.  Defendant DirectTV utilizes the other Defendants to form the "enterprise" acting together in pursuit of the common goal of obtaining hundreds of thousands, if not millions, of dollars from unsuspecting small business owners under the misrepresentation that they are illegally broadcasting the DirectTV signal in their business when it was DirectTV that solicited and set up the account at the business location, knowing it was a business location and then classifying the account as "residential".

42.    Other methods and means that Defendant J. Lonstein, W. Lonstein and LLO used to execute and perpetuate the Scheme include, but are not limited to, utilizing their name and law firm to seek to obtain money from small business owners accusing them of illegally broadcasting the DirectTV signal in their business; sending signed form collection letters through the mail to thousands, if not hundreds of thousands, of DirectTV subscribers; use of Defendant J. Lonstein and W. Lonstein's allegedly patented technology and interest in Defendant Signal Auditing to target small business to accuse of piracy; and receiving funds electronically from DirectTV subscribers bank accounts to collect the fraudulent debt.  The participation of Defendants LLO, J. Lonstein and W. Lonstein permit Defendant DirectTV to facilitate the collection of monies or initiation of legal proceedings from these subscribers.

43.    Other methods and means that Defendants Signal Auditing and W. Lonstein used to execute and perpetuate the Scheme include, but are not limited to, use of Defendant W. Lonstein's allegedly "patented technology" and interest in Defendant Signal Auditing to target small business to accuse of piracy, and use of Defendant Signal Auditing to obtain monies from Defendant DirectTV in the accusation of subscriber piracy.  The participation of Defendants Signal Auditing and W. Lonstein allow the enterprise to function more effectively given that "audits"

FIRST AMENDED CLASS ACTION COMPLAINT

would typically be performed by an uninterested third party with no financial stake in the discovery of an alleged pirated signal.  The use of the allegedly patented technology by Defendants J. Lonstein and W. Lonstein are used without any method to verify or challenge the technology.  In fact, Defendant Signal Auditing advertises to those who use its service a 4-step process to complete the audit which includes: Identifying the offender, allowing the offender to pay a fee (through LLO and Lonstein), covert the offender to a subscribing "good faith" customer (converting to a DirectTV commercial account) and prosecuting nonpaying "offenders".[3] This outline actually describes the Scheme and shows how all of the Defendants are intertwined and crucial to perpetuating the Scheme.

44.     Defendants used thousands of mail and interstate wire transactions to create and perpetuate the Scheme through virtually identical misrepresentations, concealments and material omissions.

## CLASS ALLEGATIONS

45.     This action is brought and may properly proceed as a class action, pursuant to the provisions of Rule 3.765 of the California Rules of Court.

46.     Plaintiff seeks certification of a Class and Subclasses pursuant to Federal Rules of Civil Procedure §23, which is composed of and defined as follows:

a. **CLASS:**  All business owners in the United States who, at any time on or after the day four years prior to the date on which this Complaint is filed, were solicited by Defendants, jointly and/or severally, to purchase satellite cable television services provided by DirecTV for use in connection with their business and who (a) purchased such satellite cable television services and (b) were subsequently sent correspondence from Defendants LLO, W. Lonstein and/or Lonstein on behalf of DirectTV seeking monetary payment for allegedly unauthorized use by the business of those satellite cable television services.

---

[3] http://www.signalauditing.com/piracy-solutions

FIRST AMENDED CLASS ACTION COMPLAINT

b. **SUBCLASS:**  All small business owners in the State of California who, at any time on or after the day four years prior to the date on which this Complaint is filed, were solicited by Defendants, jointly and/or severally, to purchase satellite cable television services provided by DirecTV for use in connection with their business and who (a) purchased such satellite cable television services and (b) were subsequently sent correspondence  from Defendants LLO, W. Lonstein and/or Lonstein on behalf of DirectTV seeking monetary payment for allegedly unauthorized use by the business of those satellite cable television services.

47.    The members of the Class and Subclasses for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

48.    There are questions of law and fact common to the members of the Class and Subclasses that predominate over questions affecting only individuals. These common questions include:

a. Whether Defendants' actions, as set forth herein, were unconscionable commercial practices, deception, fraud, false pretenses, and/or misrepresentations in violation of the UCL;

b. Whether the targeting of minority small business owners, such as Plaintiff, by Defendants constitutes an unconscionable business practice which violates the UCL;

c. Whether the collection efforts by Defendants constitute a sham;

d. Whether Plaintiff and the members of the Class and/or Subclasses suffered an ascertainable loss as a result of Defendants' violation(s) of the UCL;

e. Whether Defendants were employed by or associated with the enterprise, participated, directly or indirectly, in the operation and/or management of the enterprise's affairs through a pattern of racketeering activity;

f. Whether Defendants devised a scheme to defraud, entrap and/or extort;

FIRST AMENDED CLASS ACTION COMPLAINT

g. Whether the Defendants' scheme was furthered by the use of mail or wire;

h. Whether Plaintiff and the members of the Class and/or Subclasses suffered damages as a result of Defendants' violation(s) of RICO; and

i. What relief Plaintiff and the members of the Class and/or Subclasses are entitled to under the UCL and RICO.

49.     Plaintiff's claims are typical of the claims of the members of the Class and Subclasses which she represents because all such claims arise out of the same policies, practices, and conduct, and the same or similar documents used by Defendants in their dealings with Plaintiff.

50.     Plaintiff has no interests antagonistic to those of the Class and Subclasses.

51.     The Class and Subclasses, of which Plaintiff is a member, are readily identifiable.

52.     Plaintiff will fairly and adequately protect the interests of the Class and Subclasses, and has retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class Counsel has investigated and identified potential claims in the action. Proposed Class Counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of the Class and Subclasses are significant, the amount is modest compared to the expense and burden of individual litigation.

54.     The questions of law or fact common to the members of the Class and Subclasses predominate over any questions affecting only individual members.

FIRST AMENDED CLASS ACTION COMPLAINT

55.     The prosecution of separate actions by individual members of the Class and Subclasses would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action, or the prosecution of separate actions by individual members of the Class and Subclasses would create the risk that adjudications with respect to individual members of the Class and Subclasses would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Prosecution as a class action will eliminate the possibility of repetitious litigation.

56.     Defendants have acted, or refused to act, on grounds generally applicable to Plaintiff and all class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class and Subclasses as a whole.

57.     A class action will cause an orderly and expeditious administration of the claims of the Class and Subclasses, and will foster economies of time, effort and expense.

58.     Plaintiff does not anticipate any difficulty in the management of this litigation.

### FACTUAL ALLEGATIONS: PLAINTIFF DONEYDA PEREZ

59.     Plaintiff Doneyda Perez ("Ms. Perez") is the owner of Oneida's Beauty and Barber Salon, a beauty salon located at 12342 Harbor Boulevard, Garden Grove, California 92840.

60.     In or around 2014, DirecTV's' authorized representative entered the beauty salon and spoke with Ms. Perez.  The individual represented that he was acting on behalf of DirecTV and told Ms. Perez that DirecTV was offering a promotional deal which would provide her business with satellite cable television services for twenty-seven dollars and fifty cents ($27.50) a month for two (2) years.

61.     All communications with the DirecTV representative were in Spanish.

62.   As a result of DirecTV's representation, Ms. Perez was interested in purchasing the DirecTV promotional deal – which included Spanish-language channels – for her business because she wanted something for her customers to watch on television while they were in the beauty salon.  Ms. Perez thought that the deal offered by DirecTV was a good one, and therefore agreed to purchase the DirecTV promotional deal to provide her business with satellite cable television services from DirecTV for twenty-seven dollars and fifty cents ($27.50) a month for two (2) years.

63.   DirecTV never advised Ms. Perez that the satellite cable television services from DirecTV would be provided to her business under a residential account; nor did Ms. Perez ever ask that the satellite cable television services from DirecTV be provided to her business under a residential account.  Instead, based solely upon the representations from Defendants and the fact that those discussions had taken place inside the beauty salon, Ms. Perez relied upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account. Ms. Perez relied upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account.  This reliance is what induced Ms. Perez to provide Defendants with her personal information and bank information.

64.   Ms. Perez was not provided with – nor did she sign – a contract, agreement, notice or any other documents related to the DirecTV promotional deal, either at the time of installation or at any time thereafter.  Ms. Perez never signed a contract of any kind to provide her business with satellite cable television from DirecTV for twenty-seven dollars and fifty cents ($27.50) a month for two (2) years at the time she agreed to purchase the DirecTV promotional deal. Ms. Perez was only asked to provide her personal information and her bank account information to Defendants.

65.    Ms. Perez was never advised that the satellite cable television services from DirecTV would be provided to her business under a residential account. Similarly, Ms. Perez never attempted to solicit, request or direct that the satellite cable television services from DirecTV would be provided to her business under a residential account.  Based upon the representations of DirecTV and the fact the physical installation was inside the beauty salon, Ms. Perez relied upon DirecTV Defendants to provide her business with satellite cable television services from DirecTV under the correct type of account. Thereafter, the only documents related to the DirecTV promotional deal which Ms. Perez ever received were an Equipment Lease Agreement in English and the monthly invoices from DirecTV, which were sent to "2127 West Dogwood Avenue, Anaheim, California 92801." The monthly invoices did not state whether the account was commercial or residential.  *See, e.g., the copy of the June 6, 2014 invoice from DirecTV attached hereto as* **Exhibit A**.

66.    DirecTV's authorized representative, with whom Ms. Perez spoke, did not advise her that the satellite cable television services from DirecTV would be (or had been) provided to her business under a residential account; nor did Ms. Perez ever ask that the satellite cable television services from DirecTV would be provided to her business under a residential account.  Instead, based upon the fact that DirecTV had provided satellite cable television services to the salon for nearly two years, Ms. Perez continued to rely upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account.

67.    It was therefore much to Ms. Perez's surprise that she received a phone call in May 2015 from LLO, advising her they had been retained by DirecTV "regarding the unauthorized reception and commercial display of DIRECTV programming at your establishment in violation of the Federal Communications Act and DIRECTV customer agreements."   Defendant LLO accused Ms. Perez of "defrauding" and making "misrepresentations" to DIRECTV.  During the May 2015 phone call with Ms. Perez, LLO alleged that on April 8, 2015, an "independent

auditor" had "observed and recorded your exhibition of DIRECTV programming" without authorization, and threatened prosecution and/or litigation if Ms. Perez did not contact the Lonstein Defendants within seven (7) days to resolve the matter.  Ms. Perez was informed that "they" were going to sue her for $75,000 for the unauthorized use of DIRECTV services.

68.    Ms. Perez tried to explain that the DIRECTV representative that she was told she never contacted DIRECTV and their representative came to her business and installed it the same day.  The LLO representative continued to accuse Ms. Perez of misrepresentation.

69.    Over the next month, almost on a daily basis, Ms. Perez received numerous telephone calls from a representative of Defendant LLO.  The individual always identified herself as DIRECTV's attorney and threatened that if Ms. Perez did not pay the $75,000 they would report her to collections and ruin her credit.  Ms. Perez took this to mean they were claiming she owed a debt to DirecTV.  Ms. Perez continued to protest her innocence and maintain she did not owe them $75,000.  LLO disregarded Ms. Perez's claims and repeated the accusations over and over.

70.    After several calls, LLO lowered the demand to $50,000.  Ms. Perez again refused.  The LLO representative was adamant, growing angrier with each call and becoming increasingly more threatening.  Ms. Perez was sent through the mail a photograph Defendants LLO claim was "proof" Ms. Perez was misappropriating DIRECTV programming at her beauty salon.  The photo was a grainy, still photo of a television screen with unrecognizable content.

71.    After over a month of nearly daily phone calls and threats, LLO told Ms. Perez if she paid $5,000 in installments they would not take any further action.  Ms. Perez was told this was the last and final "offer".

72.    Ms. Perez received a letter, dated June 26, 2015, (the "June 26, 2015 letter") on the letterhead of the Lonstein Law Office, P.C. with an attached proposed settlement agreement.  In the proposed settlement agreement, LLO alleged that Ms.

Perez's business had used the satellite cable television services of DirecTV without authorization and threatened prosecution and/or litigation if Ms. Perez did not pay $5,000.00. *See copy of the June 26, 2015 letter and proposed settlement agreement attached hereto as* **Exhibit B**.

73.     As a result of being misled and fraudulently induced into agreeing to pay $5,000.00 in order to resolve her alleged outstanding balance with DirecTV, Ms. Perez began making monthly payments of $500.00 to LLO via wire transaction. It is unclear what percentage of this amount was paid to DirecTV. *See July 2, 2015 credit card receipt; August 7, 2015 letter; August 7, 2015 credit card receipt; American Express Authorization Form; and June 1, 2016 statement attached hereto as* **Exhibit C**. This agreement is voidable and unenforceable.

74.     The above-described conduct by Defendants in their transactions with Ms. Perez are the same and/or substantially similar to the course of conduct engaged in by Defendants in their transactions with numerous other small business owners in California who are similarly situated to Ms. Perez.

## COUNT I

### (Unfair/Unlawful Business Practices)

75.     Plaintiff re-asserts and incorporates by reference each and every allegation set forth in the preceding paragraphs as though set forth at length herein.

76.     California Business and Professions Code § 17200 et seq. (also referred to herein as the "Unfair Business Practices Act" or "Unfair Competition Law") prohibits unfair competition in the form of any unlawful, unfair or fraudulent business act or practice.

77.     Plaintiff is a "person" within the meaning of California Business and Professions Code § 17204 which allows "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to prosecute a civil action for violation of the Unfair Competition Law ("UCL").

/ / /

78.     Defendants, jointly and/or severally, engaged in unconscionable commercial practices, deception, fraud, false pretenses, racketeering activities and/or misrepresentations and violated the UCL by (1) targeting and soliciting Plaintiff and other small business owners to purchase satellite cable television services from DirecTV at a "special" price or rate; (2) installing satellite cable television services in Plaintiff's and small business owners' businesses and classifying the services as "residential" although Defendants knew or should have known that Class Members intended to use those services in their business; (3) providing satellite cable television to Class Members' businesses under a residential account although Class Members' reasonably relied upon Defendants to provide those services to their business under the proper type of account so that she could use those services in her business; (4) deliberately and specifically targeting Class Members for a "signal audit" with a resulting manufactured and pre-determined finding that Plaintiff and Class Members had "pirated" or "stolen" satellite cable television services from DirecTV by using residential satellite cable television services which were not authorized for commercial use; and (5) based upon the manufactured and pre-determined results of that signal audit, threatening Plaintiff and Class Members with prosecution and/or costly legal action for the purported theft of the satellite cable television services in order to extort an unreasonable and unconscionable "settlement" from Plaintiff and Class Members through U.S. mail, email and receipt of funds through wire transfers.  Plaintiff contends the herein alleged constitutes a violation of RICO which constitutes an "unlawful" act under the UCL.

79.     Defendants engaged in the same conduct in their transactions with small business owners similarly situated to Plaintiff. Defendants filed lawsuits and/or obtained civil judgments against some of those small business owners.  In other circumstances, Defendants secured a settlement agreement and payment under the false misrepresentation the business owner was illegally utilizing DirecTV

FIRST AMENDED CLASS ACTION COMPLAINT

services in their business.

80.    Defendants especially targeted minority small business owners, such as Plaintiff, because of Defendants' apparent belief that minority small business owners would be less likely to dispute or contest their unconscionable business practices. The targeting of minority small business owners such as Plaintiff by Defendants is itself an unconscionable business practice which violates the UCL.

81.    Defendants also engaged in the following unfair/unlawful business practices for which injunctive relief, declaratory relief and any other equitable remedies are sought:

82.    California's legislature passed the Digital Infrastructure and Video Competition Act of 2006, Public Utilities Code § 5800, et seq. ("DIVCA") because the "increasing competition for video and broadband services is a matter of statewide concern" as "video and cable services provide numerous benefits to all Californians including access to a variety of news, public information, education, and entertainment programming." DIVCA § 5810(1)(A).

83.    The regulations, promulgated under DIVCA are meant to "promote the widespread access to the most technologically advanced cable and video services to all California communities in a nondiscriminatory manner regardless of socioeconomic status" and to "require market participants to comply with all applicable consumer protection laws." DIVCA § 5810(2)(B) and (D).

84.    Similarly, California's legislature passed the Cable Television and Video Provider Customer Service and Information Act (the "Cable Act") because "customers of cable and video providers should get their money's worth for the service they subscribe to, and the one way to ensure this is to encourage that customer service standards be established and that customers be informed to those standards." California Government Code § 53054.1(a).

85.    Defendant DirecTV is a cable television company providing residential cable television services within the State of California and is therefore subject to

DIVCA and/or its enacting regulations and the Cable Act and/or its enacting regulations.

86.     The Cable Act § 53055.1(b)(1) requires that notice be given to new customers which includes "a listing of the services offered by the cable television operator or video provider which clearly describes all levels of service, and including the rates for each level of service, provided that, if the information concerning levels of service and rates is otherwise distributed to new customers upon installation by the cable television operator or video provider, the information need not be included in the notice to new customers required by this section."

87.     The Cable Act § 53055.1(a) requires that "each cable television operator or video provider shall annually distribute to employees, to each customer, and to the city, county, or city and county in which the cable television operator or video provider furnishes service to customers, a notice describing these customer service standards."

88.     Plaintiff never received a listing of the services offered by Defendants which clearly described all levels of service including the rates for each level of service (residential/commercial), as required by the Cable Act in the selection of the schedule of prices, rates, terms and conditions most favorable for her individual requirements.

89.     Plaintiff never received the annual notice required by the Cable Act which would have advised her of the customer monthly service packages and corresponding rates available according to her billing classification, nor was she even advised of her billing classification for the satellite cable television services from DirecTV.

90.     Defendants therefore violated DIVCA and the Cable Act and/or their enacting regulations by failing to (1) provide Plaintiff with the listing of services required by the Cable Act in the selection of the schedule of prices, rates, terms and conditions most favorable for her individual requirements; and/or (2) provide

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff with the annual notice required by Cable Act § 53055.1(a), which would have advised her of the monthly service packages and corresponding rates available according to her billing classification.

91.    By failing to provide Plaintiff with the required listing of services, reasonable efforts and/or timely notice of her billing classification, Defendants caused her to face potential liability for alleged unauthorized use of satellite cable television services from DirecTV, as she had no ability to have a purportedly incorrect billing classification corrected. Without the alleged unauthorized use, Defendants would have had no basis to threaten prosecution and/or litigation. Without the threatened prosecution and/or litigation, Defendants would have no basis to coerce Plaintiff into paying thousands of dollars. In other words, Plaintiff would not have "failed" the audit, but for the failure by Defendant to comply with the Cable Act.

92.    The violation of the DIVCA and the Cable Act, is evidence of and constitutes an unconscionable, unfair and/or unlawful commercial practice in violation of the UCL.

93.    The failure by Defendants to comply with DIVCA and the Cable Act was in furtherance of their scheme to improperly threaten Plaintiff with prosecution and/or litigation for purportedly unauthorized use of the satellite cable television services from DirecTV, and thereby receive "settlement" payments related to the Scheme described herein. Defendants, jointly and/or severally, therefore engaged in unconscionable commercial practices, deception, fraud, false pretenses, and/or misrepresentations and thereby violated § 17200 of the UCL.

94.    As the result of Defendants' violation of the UCL, Plaintiff has suffered an ascertainable loss, including but not limited to the monthly fees which she already paid for the satellite cable television services from DirecTV, the indebtedness incurred in the amount of $5,000.00 as demanded in the June 26, 2015 letter and proposed settlement agreement from the Lonstein Defendants, and/or the attorney's

fees related thereto.

95.     As the result of Defendants' violations of the UCL, those similarly situated to Plaintiff also suffered ascertainable losses, including but not limited to the monthly fees which they already paid for the satellite cable television services from DirecTV, the indebtedness incurred in the amount demanded in the legal correspondence sent by the Lonstein Defendants, the settlement payments they paid, and/or the attorney's fees and costs which they incurred as a result.

96.     Plaintiff and all others similarly situated are thus entitled to all appropriate legal and equitable relief, injunctive relief, declaratory relief, attorney's fees, and costs pursuant to the Business and Professions Code and California Code of Civil Procedure section 1021.5 or as otherwise authorized by statute.

## COUNT II

### (Racketeer Influenced and Corrupt Organizations Act)

97.     Plaintiff re-asserts and incorporates by reference each and every allegation set forth in the preceding paragraphs as though set forth at length herein.

98.     RICO further provides that, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

99.     RICO also provides that "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

100.    At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3), because they were individuals and/or entities capable of holding a legal or beneficial interest in property.

101.    DirecTV is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). DirecTV conducted the pattern of racketeering activity described herein. Defendant

DirecTV engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

102.   Defendant Signal Auditing is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Defendant Signal Auditing conducted the pattern of racketeering activity described herein. Defendant Signal Auditing engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

103.   Defendant LLO is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) Defendant LLO conducted a pattern of racketeering activity described herein. Defendant LLO engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

104.   All Defendants constitute an associated-in-fact enterprise in that they acted together with a common purpose of obtaining money from small business owners accusing them of violating federal laws and theft of services for maintaining residential DirecTV service in a commercial establishment.

105.   As set forth herein above Defendants' Scheme was to defraud and extort purported "settlements" from innocent consumers threatened with sham litigation resulting from entrapment.   In furtherance of the Scheme Defendants improperly received money, in addition to the monthly fees which they already collected, by way of misrepresenting indebtedness to small business owners/victims.  This is a fraudulent practice, and is a "racketeering activity" subject to RICO.

106.   The Defendants constitute an enterprise whose common purpose was to increase revenues to each Defendant through the Scheme described herein.

107.   Defendants have engaged in a pattern of racketeering activity as that phrase is defined in 18 U.S.C. §1961(5), and therefore have violated 18 U.S.C. § 1962(c), by receiving income from unlawful debt, in the form of monthly fees, alleged indebtedness, settlement payments, either paid or to be paid, in the operation of an enterprise which is engaged in or the activities of which affect trade or commerce.

a.   **Mail Fraud:**   Defendants violated 18 U.S.C. §1341, by sending or receiving or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the Scheme, which amounts to a material scheme to defraud and obtain money on false pretenses, misrepresentations, and/or omissions. Defendants' use of mail formed a central feature of the scheme and included communications by form letters from LLO on LLO letterhead listing the Lonstein Defendants as attorneys mailed to class member targets of the Scheme and the series of follow up notices mailed to class members who did not fully pay the demanded amounts in response to the initial letter as described herein.   In addition, class member victims were instructed by Defendants to send payments demanded either by wire as discussed below or by certified check through the U.S. Mail.

b.   **Wire Fraud**:   Defendants   violated   18   U.S.C.   §1343,   by transmitting, receiving or causing to be transmitted or received materials and monies by wire for the purpose of executing the Scheme to defraud and obtain money on false pretenses, misrepresentations and/or omissions.   Defendants instructed Plaintiff and class members to make payments through the use of interstate wire communications in violation of 18 U.S.C. §1343. The materials transmitted and/or received include but are not limited

FIRST AMENDED CLASS ACTION COMPLAINT

to, interstate credit card or bank transactions, emails to the target business owners, ACH debit transactions, and/or PayPal wire transmission.

108. Defendants violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise engaged in trade or commerce through a pattern of racketeering activity or attempting collection of unlawful debt by misrepresenting amounts claimed in damages as amounts actually owed.

109. Defendants violated 18 U.S.C. § 1962(d) by conspiring to engage in racketeering activity.

110. Defendants, individually and jointly, as part of an enterprise agreed to commit more than two racketeering acts, with knowledge that the objective was unlawful and intended to further that unlawful objective. The multiple acts of racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

111. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include wire fraud and mail fraud as described herein to perpetuate the Scheme described herein: (a) targeting and soliciting small business owners to purchase satellite cable television services from DirecTV at a "special" price or rate; (b) establishing a residential satellite cable television service account for the small businesses although Defendants knew or should have known that the small business owners intended to use those services in their businesses; (c) providing satellite cable television to small businesses under residential accounts although the small business owners relied upon Defendants to provide commercial services; (d) deliberately and specifically targeting small business owners for a "signal audit" based on a pre-determined finding that the small business owners had "pirated" or "stolen" satellite cable television services from DirecTV; and (e) threatening the small business

owners with repeatedly factual and legal misrepresentations in the form of claims of amounts actually "owed", threats of damage to credit profile, threats of sham prosecution and/or costly legal action, all undertaken in order to extort an unreasonable and unconscionable "settlement" from them.

112. Defendants' predicate acts of racketeering amount to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions.

113. Defendants knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose. Defendants either knew or recklessly disregarded that these were material representations and omissions.

114. Plaintiff and those similarly situated to her have suffered harm and have been injured from Defendants' violations of RICO in the amount of the monthly fees, indebtedness, settlement payments, either paid or to be paid. In the absence of Defendants' violations of 18 U.S.C. § 1962, Plaintiff and the Class would not have incurred these losses.

115. Plaintiff's and the Class's injuries were directly and proximately caused by Defendants' racketeering activity.

116. Defendants knew and intended that Plaintiff and the Class would rely on the scheme's fraudulent representations and omissions. Defendants knew and intended Plaintiff and the Class would pay monies to Defendants as a result of same.

117. Plaintiff and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to 18 U.S.C. § 1964(c).

/ / /

/ / /

/ / /

/ / /

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, demands judgment against Defendants as follows:

a.     An order certifying the Class and Subclasses for declaratory and injunctive relief and for money damages under Federal Rules of Civil Procedure Rule 23, and appointing Plaintiff as Class and Subclasses Representative and appointing her attorneys as Class Counsel;

b.     A declaratory judgment that Defendants violated the UCL and/or RICO and any settlement entered into as a result of the Scheme are null and void as fraudulent;

c.     A judgment for injunctive relief enjoining Defendants from engaging in future violations of the UCL and/or RICO; orders Defendants engage in a corrective notice campaign, and requiring Defendants to refund to Plaintiff and all Class Members the funds paid;

d.     An accounting of all amounts that Defendants collected from Plaintiff and Class Members as a result of the Scheme;

e.     A judgment for actual damages;

f.     A judgment for compensatory damages;

g.     A judgment for disgorgement of profits under the UCL;

h.     A judgment for treble damages under RICO;

i.     A judgment for reasonable attorney fees and costs of suit in connection with this action, pursuant to the UCL and/or RICO, California Civil Code 1021.5 and any other applicable statute;

j.     A judgment for pre-judgment and post-judgment interest; and/or

k.     A judgment for all such other and further relief as the Court deems equitable and just.

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues subject to trial.

Dated: September 1, 2017               **MAHONEY LAW GROUP, APC**

                                       **LISA L. CAY, ATTORNEY AT LAW**


                                       */s/Kevin Mahoney*
                                       Kevin Mahoney
                                       Katherine J. Odenbreit
                                       Atoy H. Wilson
                                       Lisa L. Clay (*Pro Hac Vice Pending*)

                                       Attorneys for Plaintiff, DONEYDA PEREZ, and
                                       on behalf of all others similarly situated

FIRST AMENDED CLASS ACTION COMPLAINT