Kevin Mahoney (SBN: 235367)
kmahoney@mahoney-law.net
Katherine J. Odenbreit (SBN: 184619)
kodenbreit@mahoney-law.net
**MAHONEY LAW GROUP, APC**
249 East Ocean Blvd., Suite 814
Long Beach, CA 90802
Telephone: (562) 590-5550
Facsimile: (562) 590-8400

Attorneys for Plaintiff DONEYDA PEREZ, as an individual, and on behalf of all
others similarly situated [additional counsel below]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| DONEYDA PEREZ as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTV GROUP HOLDINGS, LLC, a Delaware Corporation, LONSTEIN LAW OFFICES, P.C., a New York Professional Corporation; SIGNAL AUDITING, INC., a New York Corporation, JULIE COHEN LONSTEIN and WAYNE M. LONSTEIN,<br><br>Defendants. | Case No.: 8:16-CV-01440-JLS-DFM<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**<br><br>Assigned for All Purposes to:<br>Hon. Josephine L. Staton; Dept. 10A<br><br>Complaint Filed:   August 4, 2014<br>Trial Date:         None Yet Set<br><br>**REQUEST FOR JURY TRIAL** |

- 1 -

THIRD AMENDED CLASS ACTION COMPLAINT

Lisa L. Clay
lisa@clayatlaw.com
Lisa L. Clay, Attorney at Law
2100 Manchester Road, Suite 1612
Wheaton, IL 60187
Telephone: (630) 456-4818

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD AMENDED CLASS ACTION COMPLAINT

1  Plaintiff DONEYDA PEREZ ("Ms. Perez" or "Plaintiff"), on behalf of herself
2  and all others similarly situated, complains and alleges as follows:

3  ## NATURE OF THE CASE

4  1.  This is a putative class action brought on behalf of Plaintiff Doneyda
5  Perez and all others similarly situated arising from the scheme to defraud and extort
6  purported "settlements" from innocent consumers threatened with sham litigation
7  resulting from entrapment (hereinafter the "Scheme"), perpetrated by Defendants
8  DIRECTV GROUP HOLDINGS, LLC, DIRECTV, LLC, and DIRECTV Holdings,
9  LLC,(collectively "DirecTV"), LONSTEIN LAW OFFICES, P.C. ("LLO"),
10  SIGNAL AUDITING, INC. ("Signal Auditing"),JULIE COHEN LONSTEIN ("J.
11  Lonstein") and WAYNE M. LONSTEIN ("W. Lonstein") (hereinafter collectively
12  referred to as "Defendants").

13  2.  Defendants have, and continue to engage in, a Scheme and course of
14  conduct in which the owners of small businesses in the United States are the focus
15  of unsolicited sales campaigns from DirecTV, through its employees and
16  independent contractor salespeople and/or installers to sell satellite cable television
17  services.  When a small business owner purchases DirecTV services, they are often
18  unwittingly provided with residential service accounts even when they specifically
19  request a commercial account or when the DirecTV representative solicits service in
20  their business location for their business. DirecTV and/or its agents do not provide
21  the business owners with any written contracts, agreements, notices, or other
22  documents regarding the type of satellite cable television services which they have
23  purchased, in part to hide the fraudulent nature of the Scheme.

24  3.  Despite DirecTV having been the subject of a nationwide investigation
25  into questionable marketing and sales tactics, resulting in a consent decree with 48
26  Attorneys General, these practices continue to this day.

27  4.  Small business owners like Plaintiff do not solicit, request or direct that
28  the satellite cable television services which they have purchased be provided under

a residential account; rather, they rely upon Defendant DirecTV and its authorized agents to provide the satellite cable television services which they have purchased for their business under the proper type of commercial accounts.

5.    Without the business owners being made aware, DirecTV designates the accounts as "residential," despite the fact that DirecTV and/or its agents solicit small business owners like Ms. Perez, and those similarly situated in their business establishments, for business services.

6.    DirecTV does no internal audits of these small business installations. To the contrary, DirecTV relies completely on the information obtained from its thousands of employees, agents, and independent contractor agents to set up the DirecTV account. Despite the fact that order forms, customer agreements, and other documents provided to the small business customer make no reference to the residential nature of the account, DirecTV does nothing to verify that the customer has received the requested account. Rather, without investigation, DirecTV presumes that any small business customer with a residential account is illegally stealing from DirecTV, an uses that improper assumption to engage in the Scheme described herein.

7.    The Defendants' Scheme is engendered by the Communications Act, which provides for terrifyingly-high looking statutory damage awards and the provision for an award of attorneys' fees to the "aggrieved party" which can only be the plaintiff, or in this case DirecTV, with no mutual provision for the innocent defendant (business owner) who succeeds in defending him/herself. The Communication Act is therefore rife for abuse by these and plaintiffs that rely on similar schemes.

8.    Defendants perpetrate the Scheme using interstate wire and mails threatening sham litigation as follows:

    a.    DirecTV and Lonstein Law Office ("LLO") have a long-standing contingency model arrangement: DirecTV, LLO and Signal

THIRD AMENDED CLASS ACTION COMPLAINT

Auditing perpetuate the Scheme described herein and share in the profits;

b. LLO created Signal Auditing solely for the purpose of funneling audits to a captive entity that it could control, and from which it could profit. Signal Auditing is owned, managed, and controlled by J. Lonstein and W. Lonstein. It maintains no contractual relationship with LLO and recognizes no corporate formalities that distinguish it from LLO other than incorporation, which is a minor formality. In all other respects it is a captive arm of LLO. Its primary, if not only purpose, is to conduct audits related to this Scheme or schemes of a similar nature; and

c. DirecTV installs the satellite cable television services and defines the account improperly as residential and not commercial.

9. DirecTV provides to Scheme participants/agents Signal Auditing, LLO, J. Lonstein, and/or W. Lonstein a list of authorized commercial establishments (the "Legal List") on a weekly, bi-weekly, or monthly basis. The Legal List is updated by DirecTV and provided to Scheme participants Signal Auditing, LLC, J. Lonstein, and/or W. Lonstein on a weekly, bi-weekly, or monthly basis. Scheme participant/agent Signal Auditing, overseen by Scheme participant/agents LLO, J. Lonstein, and/or W. Lonstein, employs contract "auditors/investigators" to gather "evidence" of the purported commercial use of residential accounts. Signal Auditing's involvement in the Scheme is to provide these "auditors/investigators" to Scheme participant/agents LLO, J. Lonstein, and W. Lonstein for purposes of entrapping unsuspecting victims. Signal Auditing agents are directed and controlled by LLO, J. Lonstein, and W. Lonstein.

10. Scheme participants/agents Signal Auditing, LLO, J. Lonstein, and/or W. Lonstein distribute the Legal List from DirecTV to their employee/agent

THIRD AMENDED CLASS ACTION COMPLAINT

1  auditors/investigators, who are instructed *not* to surveille establishments or provide

2  audit reports regarding establishments on that list. Instead, they are told to locate

3  small business establishments that are *not* on the Legal List, and provide an "auditor

4  report" – a form that indicates "proof" of the alleged violation.  Upon information

5  and belief, Defendant members of the Scheme work in concert to target minority

6  business districts where DirecTV installers have previously solicited.  This

7  information is sought out by Defendant Signal Auditing by trolling minority-owned

8  small business districts actively looking for "violations".  If the auditor/investigator

9  locates a small business that is not on the Legal List but is displaying DirecTV

10  programming, the Signal Auditing auditor/investigator clandestinely obtains

11  photographs and/or video recordings which purport to show that the business in

12  question is using residential satellite cable television services in a commercial

13  establishment. In some circumstances, Defendant Signal Auditing will enter a

14  business posing as a paying patron and ask to change the TV channel to find a

15  purported DirecTV program even if such programming is not currently being

16  broadcast at the time of the visit.

17       11.  The auditor/investigator then provides Signal Auditing/LLO

18  "evidence" on a form affidavit drafted by Signal Auditing and/or LLO.  Payment to

19  the auditor/investigator is made only if the auditor/investigator provides a "hit" – i.e.

20  their signature on the form affidavit indicating a "violation". In other words, they

21  are not paid unless they find a purported violation.

22       12.  Scheme participants LLO, Signal Auditing, J. Lonstein, and/or W.

23  Lonstein then forward the auditor/investigator "hits" back to DirecTV so that

24  DirecTV can confirm that the hit represents an allegedly improper residential

25  account in a commercial establishment.

26       13.  Prior to AT&T owning DirecTV, i.e. at some of the time material

27  hereto, and at the time this Plaintiff was harmed, DirecTV did not pay for audit hits

28  unless there were proceeds for the Scheme participants to share. Said another way,

- 6 -

Signal Auditing did not invoice DirecTV for auditor/investigator hits. Instead, the cost of those hits was deducted by LLO from the proceeds of the Enterprise.

14.   If there are no Scheme proceeds, prior to the AT&T takeover of DirecTV, Scheme participants/agents LLO, Signal Auditing, J. Lonstein, and W. Lonstein had to absorb the cost of any hit that did not result in Scheme proceeds. After the takeover by AT&T of DirecTV, and after this action was filed, upon information and belief, Signal Auditing "invoices" DirecTV for all hits, likely to provide the Scheme some appearance of legitimacy.

15.   DirecTV then authorizes LLO to open a new file and begin extortion efforts.

16.   LLO does nothing independently to verify whether DirecTV records are correct, whether the account was directly solicited by DirecTV, and the only due diligence done prior to initiating Scheme extortion efforts is to verify that LLO is contacting the appropriate individuals/owners of the business.

17.   LLO then launches a campaign of emails, telephone calls and threatening, intentionally vague, and exaggerated demand letters to innocent small business owner consumers threatening an action against them for violating the federal Communications Act of 1934.[1] These business owners are told they have "defrauded" DirecTV, "owe" DirecTV tens of thousands of dollars; they are misled about the strict liability, intent and knowledge components of the statute, and are threatened with ruined credit and lawsuits.  LLO's only reason for not pursuing a small business owner consumer is if they learn the consumer is in bankruptcy or unable to pay, or if the consumer threatens legal action (i.e. counterclaims or class action claims).

---

[1] J. Lonstein referred to these demand letters in a 2018 deposition as "claim letters," that "invite the presumed pirate to please contact us to discuss the facts and circumstances of this allegation of commercial misuse." J. Lonstein also testified at that same deposition that any consumer who suggested they had requested a commercial account but been provided a residential account would be referred back to DirecTV for "investigation," but could provide no details regarding what, if any investigation ever takes place.

THIRD AMENDED CLASS ACTION COMPLAINT

18.   Defendants' threatened legal actions are a sham because: (1) DirecTV installed the residential services at a business and knows the programming is being shown at the business; (2) Despite knowing this; Signal Auditing, LLO, and the Lonsteins make misrepresentations of fact and law in their threatening communication with these victims; and (3) LLO and the Lonsteins have no intention of actually filing litigation, but will threaten to do so for tactical purposes, to instill fear and increase the Scheme proceeds.

19.   The only purpose of LLO and Lonsteins' calls and demand letters is to frighten innocent small business owners into paying settlement demands that are made solely for the purpose of extorting a sum of money the innocent victim will believe is a better outcome than having to defend the litigation or repair their credit;

20.   The demand letters, emails and telephone calls start with outrageous monetary demands for alleged "damages" and attorney's fees, usually between $25,000.00 - $100,000.00.

21.   After LLO has sufficiently terrified the small business owners, LLO offers the consumer a "choice:" (1) pay a lump sum of money (usually between $10,000.00 - $20,000.00) or (2) pay a lower lump sum (usually between $5,000 - $10,000.00) **and** sign up for a lengthy commitment as a DirecTV commercial customer for a higher monthly cost[2];

22.   In the rare case that a lawsuit is actually filed against those business owners who refuse to pay, that litigation is a sham because the claim is based on the known false premise the small business owner has had unauthorized access to DirecTV services, among other false misrepresentations of fact and law as identified

---

[2] By requiring a lengthy term contract, DirecTV avoids many of the loopholes that both residential and commercial consumers use – agreeing to "promotional" packages and then cancelling as soon as the promotion expires.  Further, it allows DirecTV to increase its profits by turning lower residential rate accounts into longer term higher rate business accounts which the customer may have declined originally if the higher rates were disclosed.

THIRD AMENDED CLASS ACTION COMPLAINT

herein, when it is DirecTV who set up the customer for the threatened litigation by purposely misleading the consumer and installing residential services in a commercial establishment under false pretenses.   Further, the account origin (business or residential solicitation) is easily identifiable by DirecTV, LLO and Signal Auditing (through LLO and/or DirecTV).

23.   Utilization of Defendant Signal Auditing allows the enterprise to function more effectively given that "audits" would typically be performed by an uninterested third party with no financial stake in the discovery of an alleged pirated signal. Defendant Signal Auditing advertises to those who use its service a 4-step process to complete the audit which includes: Identifying the offender, allowing the offender to pay a fee (through LLO and Lonstein), covert the offender to a subscribing "good faith" customer (converting to a DirectTV commercial account), and prosecuting nonpaying "offenders".[3]  This outline actually describes the Scheme in part and shows how all of the Defendants are intertwined and crucial to perpetuating the Scheme.

24.   Defendants do not confine themselves to minority small business owners, however, they target minority small business owners with the belief that such owners are less likely to dispute or challenge the allegations because they are unable by virtue of smaller profit margins to mount a vigorous defense or seek immediate legal counsel.

25.   Thus, in addition to the monthly fees already paid by the small businesses for the satellite cable television services, Defendants have obtained thousands, if not millions of dollars in Scheme proceeds paid to Defendants as "settlements," by the small business owners who have been their victims and DirecTV has gained millions of dollars in additional commercial accounts improperly obtained by fraud.

---

[3] http://www.signalauditing.com/piracy-solutions

THIRD AMENDED CLASS ACTION COMPLAINT

26.     Due to their course of conduct, Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

27.     Ms. Perez therefore seeks monetary damages under RICO, on behalf of herself, and all others similarly situated within the United States.

## THE PARTIES

28.     Plaintiff Doneyda Perez ("Plaintiff") is an individual residing in Anaheim, California.  Ms. Perez is the sole owner of Oneida's Beauty and Barber Salon, a beauty salon located at 12342 Harbor Boulevard, Garden Grove, California 92840.

29.     Defendant DIRECTV, LLC was a Delaware corporation whose principal place of business was 2230 East Imperial Highway, El Segundo, California. DIRECTV, LLC issued bills to DIRECTV subscribers.

30.     Defendant DIRECTV Holdings, LLC was a Delaware limited liability company and had its principal place of business at 2230 East Imperial Highway, El Segundo, California. It was the U.S. operating arm of DIRECTV, Inc.

31.     In 2014, AT&T announced a merger to acquire DIRECTV, Inc. DIRECTV, LLC and DIRECTV Holdings LLC.In or around June 2015, pursuant to the merger, DIRECTV, LLC, DIRECTV, Inc. and DIRECTV Group Holdings were merged into Steam Merger Sub, LLC, a subsidiary of AT&T and subsequently renamed DIRECTV Group Holdings, LLC.

32.     DIRECTV Group Holdings, LLC is a Delaware limited liability company whose principal place of business is 675 W. Peachtree Street, N.W., Suite 2756, Atlanta Georgia.  Defendant DIRECTV Group Holdings, LLC is a successor-in-interest to most if not all DIRECTV entities.

33.     Defendants DIRECTV, LLC, DIRECTV Holdings, LLC, and DirecTV Group Holdings, LLC are collectively referred to as ("DirecTV")

34.     At all times relevant hereto, Defendant DirecTV was and is engaged in the business of acquiring, promoting, selling, and distributing digital entertainment

- 10 -

THIRD AMENDED CLASS ACTION COMPLAINT

1   (*i.e.*, broadcast and premium television programming), primarily through satellite
2   transmission to residential and commercial subscribers throughout the United States
3   and issue bills to commercial and residential subscribers.

4       35.    Defendant Lonstein Law Office, P.C. ("Defendant LLO"), is a
5   professional corporation organized under the laws of the State of New York. At all
6   times relevant hereto, the Lonstein Law Office, P.C. was, and is, a law firm retained
7   by DirecTV to, *inter alia*, prosecute alleged thefts by small businesses in California
8   of the satellite cable television services of DirecTV. Julie Cohen Lonstein and
9   Wayne Lonstein are the named partners of LLO.

10       36.    Defendant Julie Cohen Lonstein ("Defendant J. Lonstein"), is an
11   individual who is licensed to practice law in the State of New York, and is a partner
12   with the Lonstein Law Office, P.C. At all times relevant hereto, Defendant Lonstein
13   is, and was, lead counsel for Defendant Signal Auditing and listed as "co-inventor"
14   on the patent application Defendant Signal Auditing has filed relating to its allegedly
15   proprietary methods of detecting signal piracy.

16       37.    Defendant Signal Auditing, Inc. ("Signal Auditing"), is a corporation
17   organized under the laws of the State of New York and maintains its principal place
18   of business in Ellenville, New York. The address listed for Defendant Signal
19   Auditing, Inc. is the same address as Defendant Lonstein Law Office. At all times
20   relevant hereto, Signal Auditing was and is engaged in the business of nationwide
21   auditing of commercial and residential piracy of telecommunication subscribers, as
22   overseen by Defendant Lonstein.

23       38.    Defendant Wayne Lonstein ("Defendant W. Lonstein"), is an
24   individual who is licensed to practice law in the State of New Jersey, Pennsylvania,
25   and Massachusetts. At all times relevant hereto, Defendant W. Lonstein is, and was,
26   lead counsel for Defendant Signal Auditing and listed as "co-inventor" on the patent
27   application Defendant Signal Auditing has filed relating to its allegedly proprietary
28   methods of detecting signal piracy.

THIRD AMENDED CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

39.     This action arises under the laws of the United States.  This Court has original jurisdiction over the subject matter of this action pursuant to both U.S.C. § 1964, which entitles the Court to hear claims brought under 18 U.S.C. § 1962, and also pursuant to 28 U.S.C. § 1331, which gives the court jurisdiction over actions that arise under the laws of the United States.

40.     This Court has personal jurisdiction over Defendants because they have significant minimum contacts with this State, and intentionally availed themselves of the laws of California by transacting a substantial amount of business throughout the State and this District, including, but not limited to, the promotion, marketing, advertising, and sale of cable television services by DirecTV throughout the Central District of California, Southern Division.

41.     Venue is proper in this Court under 28 U.S.C. § 1391(b). Plaintiff resides in the Central District of California, Southern Division, and Defendants are located in, and do business in, the Central District of California, Southern Division. All of the events that are the subject of this Complaint took place in the Central District of California, Southern Division.

## RICO FACTUAL ALLEGATIONS

42.     DirecTV maintained authorized sales representatives throughout the United States instructed by DirecTV to solicit small businesses and install DirecTV equipment and services.

43.     Defendant Signal Auditing conducts audits nationwide on behalf of DirecTV and/or LLO, J. Lonstein and W. Lonstein.  J. Lonstein and W. Lonstein act as corporate counsel for Defendant Signal Auditing.

44.     At all times relevant hereto, Defendants J. Lonstein, W. Lonstein, Signal Auditing, and LLO acted for, or on behalf of, DirecTV in undertaking the acts and/or omissions alleged herein.

- 12 -

THIRD AMENDED CLASS ACTION COMPLAINT

45.     The "Scheme" begins with DirectTV representatives targeting and soliciting small, primarily minority-owned businesses to purchase DirectTV satellite cable services at a "special rate" to broadcast in their commercial establishment. After the business owner agrees to purchase DirectTV services, the equipment is immediately installed at their place of business.  DirectTV then internally designates the account as "residential."  DirecTV then provided to Scheme participants Signal Auditing and/or LLO of a "Legal List" of DirecTV customers who *should not* be targeted for investigation.

46.     Based on the "Legal List" and at the direction of Scheme participants DirecTV, LLO and Signal Auditing, Signal Auditing auditors/investigators are directed to audit minority small business districts where DirecTV installers previously solicited DirecTV services.

47.     If an auditor/investigator is successful in locating a "hit", LLO and/or Signal Auditing provide the auditor/investigator affidavit to DirecTV.   Signal Auditing transmits the "Site Inspection" or "hit" to LLO. The "hit" is directed back to DirecTV so that DirecTV can confirm its records list the account as "residential".

48.     Scheme participants LLO and Lonstein, initiate telephone calls and letters sent through email, the U.S. Mail and Wire to threaten these small business owners with credit reporting, "owed" debts, and sham litigation unless they pay outrageous sums of money.

49.     Through LLO and Lonstein, business owners are offered two choices: (1) pay a high flat rate ($25,000-$100,000 or more) and be "done with the matter", or; (2) pay an amount a lesser flat amount **and** sign up for an extended contract for DirectTV commercial account paying a higher monthly rate on a continuous basis. When a small business owner refuses to choose, Defendants Lonstein and LLO lower the amount and continue the barrage of calls until the small business owner relents.

THIRD AMENDED CLASS ACTION COMPLAINT

50.     Plaintiff is informed and believes LLO and Lonstein rarely, if ever, follow through with actual litigation because the threat of litigation is a sham to secure payment from the business owners and additional commercial accounts for DirecTV.

51.     Those customers who did/do pay were/are required to sign an agreement to transmit electronically (wire), either directly through an online payment service, or a direct debit from their bank account to Defendant LLO.  This Scheme is premised on fraudulent misrepresentations of fact by Defendant DirectTV to the business owner that they are signing up for an account for their business which DirectTV later contends is categorized by it as a residential account unbeknownst to the business owner. The Scheme continues with Defendant Signal Auditing's "audit" of the business and the "determination" that the business is unlawfully broadcasting DirectTV programming in a commercial establishment. That information is then passed onto DirectTV, LLO, and Lonstein.

52.     Finally, LLO and Lonstein, on behalf of DirectTV, make repeated factual and legal misrepresentations to the business owners in telephone calls and letters sent via U.S. Mail, falsely claiming that the business owners/victims have violated "state and federal law" and "owe" DirecTV and LLO money.

53.     The Scheme provides lucrative proceeds for the Scheme Defendants. The result of the activities of the Scheme provides substantial additional money and/or increased revenue for Scheme Defendant DirecTV from accounts converted to commercial at commercial rates; thousands, if not millions, of dollars in "settlement" amounts; fees paid to Defendant Signal Auditing for "discovering" the "piracy;" and substantial legal fees for Defendants J. Lonstein, W. Lonstein, and LLO in the form of their "cut" (40%) of the "settlement" amounts.

54.     This conduct occurred consistently throughout the United States from at least four years preceding the filing of the initial complaint in this matter and continues to the present.  Complaints by business owners from around the country

THIRD AMENDED CLASS ACTION COMPLAINT

establish the continuous nature of the enterprise. Plaintiff is informed and believes the Lonstein Defendants and DirectTV have collected millions of dollars from this Scheme. In 2015, Defendants LLO and Lonstein admitted via declaration, submitted by Julie Cohen Lonstein, that she, Defendant W. Lonstein, and their firm sent over 400 letters similar to the letters sent to Plaintiff in this case in New Jersey alone during a six-year period to DirectTV subscribers similarly situated to Plaintiff. Therefore, the Scheme has been continuous and perpetuated by Defendants for many years and Plaintiff is informed and believes it is continuing to date.

55.    Defendants were knowingly and willing participants in the Scheme, and reaped revenues and/or profits therefrom.

56.    Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, Defendants acting collectively engaged in activity constituting a violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud), the predicate acts. The racketeering activity was made possible by the regular and repeated use of the services and distribution channels of Defendant DirecTV, the auditing services of Defendants Signal Auditing and W. Lonstein and the legal services of Defendants Lonstein and LLO.

57.    Defendants DirectTV, Lonstein, W. Lonstein, Signal Auditing, and LLO committed multiple "Racketeering Acts," as described herein, including aiding and abetting such acts.

58.    The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.

59.    In devising and executing the Scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343, in that they devised and knowingly carried out a material scheme or artifice to defraud or to obtain money by means of materially false or fraudulent pretenses, representations,

- 15 -

promises, or omissions of material facts. For the purpose of executing the Scheme, Defendants committed these Racketeering Acts, intentionally and knowingly, with the specific intent to advance the Scheme.

60.     Other methods and means that Defendant DirectTV used to execute and perpetrate the Scheme include, but are not limited to, providing subscriber information that they know or should know may contain significant errors to Defendants LLO, Lonstein, W. Lonstein, and/or Signal Auditing for the purpose of initiating an audit of targeted subscribers; utilizing agents to solicit small businesses for DirectTV services who misrepresent that the small business subscribers are obtaining a commercial account when they are designated by DirectTV as "residential subscribers;" and receiving collected funds electronically from Defendants Lonstein and/or LLO. Defendant DirectTV utilizes the other Defendants to form the "enterprise" acting together in pursuit of the common goal of obtaining hundreds of thousands, if not millions, of dollars from unsuspecting small business owners under the misrepresentation that they are illegally broadcasting the DirectTV signal in their business when it was DirectTV that solicited and set up the account at the business location, knowing it was a business location and then classifying the account as "residential," a practice that is, at its essence, entrapment.

61.     Other methods and means that Defendant J. Lonstein, W. Lonstein, and LLO used to execute and perpetuate the Scheme include, but are not limited to, utilizing their name and law firm to seek to obtain money from small business owners accusing them of illegally broadcasting the DirectTV signal in their business; sending threatening and misleading  form demand letters through the mail to thousands, if not hundreds of thousands, of DirectTV subscribers; use of Defendant J. Lonstein and W. Lonstein's allegedly patented technology and interest in Defendant Signal Auditing to target small business to accuse of piracy; and receiving funds electronically from DirectTV subscribers' bank accounts to collect Scheme proceeds. The participation of Defendants LLO, J. Lonstein, and W. Lonstein permit

Defendant DirectTV to facilitate the collection of monies by threatening, or in very rare cases, actually initiating legal proceedings against these small business owner consumers.

62.     Other methods and means that Defendants Signal Auditing, J. Lonstein, and W. Lonstein used to execute and perpetuate the Scheme include, but are not limited to, use of Defendant W. Lonstein's allegedly "patented technology" and interest in Defendant Signal Auditing to target small business to accuse of piracy, and use of Defendant Signal Auditing to obtain monies from Defendant DirectTV in the accusation of subscriber piracy. The participation of Defendants Signal Auditing and W. Lonstein allow the enterprise to function more effectively given that "audits" would typically be performed by an uninterested third party with no financial stake in the discovery of an alleged pirated signal.  Defendant Signal Auditing's process is not a patentable process. Indeed, Signal Auditing advertises to those who use its service, a 4-step process to complete the audit which includes: Identifying the offender, allowing the offender to pay a fee (through LLO and Lonstein), covert the offender to a subscribing "good faith" customer (converting to a DirectTV commercial account), and prosecuting nonpaying "offenders."[4] This outline actually describes the Scheme and shows how all of the Defendants are intertwined and crucial to perpetuating the Scheme.

63.     Defendants used thousands of mail and interstate wire transactions to create and perpetuate the Scheme through virtually identical misrepresentations, concealments and material omissions.

## CLASS ALLEGATIONS

64.     This action is brought and may properly proceed as a class action, pursuant to the provisions of Federal Rules of Civil Procedure, Rule 23.

---

[4] http://www.signalauditing.com/piracy-solutions

THIRD AMENDED CLASS ACTION COMPLAINT

65.     Plaintiff seeks certification of a Class and Subclasses pursuant to Federal Rules of Civil Procedure 23, which is composed of and defined as follows:

a.      **CLASS:** All business owners in the United States who, at any time on or after the day four years prior to the date on which the original Complaint was filed, were solicited by Defendants, jointly and/or severally, to purchase satellite cable television services provided by DirecTV for use in connection with their business and who: (a) purchased such satellite cable television services and (b) were subsequently received communications from Defendants LLO, W. Lonstein, and/or J. Lonstein on behalf of DirectTV seeking monetary payment for allegedly unauthorized use by the business of those satellite cable television services.

b.      **SUBCLASS:** All small business owners in the State of California who, at any time on or after the day four years prior to the date on which the original complaint was filed, were solicited by Defendants, jointly and/or severally, to purchase satellite cable television services provided by DirecTV for use in connection with their business and who: (a) purchased such satellite cable television services and (b) were subsequently received communications  from Defendants LLO, W. Lonstein and/or J. Lonstein on behalf of DirectTV seeking monetary payment for allegedly unauthorized use by the business of those satellite cable television services.

66.     The members of the Class for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

67.     There are questions of law and fact common to the members of the Class and Subclasses that predominate over questions affecting only individuals. These common questions include:

a.      Whether Defendants were employed by or associated with the enterprise, participated, directly or indirectly, in the operation and/or management of the enterprise's affairs through a pattern of racketeering activity;

b.      Whether Defendants devised a scheme to defraud, entrap, and/or extort;

THIRD AMENDED CLASS ACTION COMPLAINT

    c.    Whether the Defendants' scheme was furthered by the use of mail or wire;

    d.    Whether Plaintiff and the members of the Class and/or Subclasses suffered damages as a result of Defendants' violation(s) of RICO; and

    e.    What relief Plaintiff and the members of the Class and/or Subclasses are entitled to under the UCL and RICO.

68.    Plaintiff's claims are typical of the claims of the members of the Class which she represents because all such claims arise out of the same policies, practices, and conduct, and the same or similar documents used by Defendants in their dealings with Plaintiff.

69.    Plaintiff has no interests antagonistic to those of the Class and Subclasses.

70.    The Class, of which Plaintiff is a member, are readily identifiable.

71.    Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class counsel has investigated and identified potential claims in the action. Proposed Class counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

72.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of the Class are significant, the amount is modest compared to the expense and burden of individual litigation.

73.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members.

74.    The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, which would establish

THIRD AMENDED CLASS ACTION COMPLAINT

incompatible standards of conduct for the Defendants in this action, or the prosecution of separate actions by individual members of the Class and Subclasses would create the risk that adjudications with respect to individual members of the Class and Subclasses would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Prosecution as a class action will eliminate the possibility of repetitious litigation.

75.     Defendants have acted, or refused to act, on grounds generally applicable to Plaintiff and all class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes a whole.

76.     A class action will cause an orderly and expeditious administration of the claims of the Class and Subclasses, and will foster economies of time, effort and expense.

77.     Plaintiff does not anticipate any difficulty in the management of this litigation.

**FACTUAL ALLEGATIONS: PLAINTIFF DONEYDA PEREZ**

78.     Plaintiff Doneyda Perez ("Ms. Perez"), is the owner of Oneida's Beauty and Barber Salon, a beauty salon located at 12342 Harbor Boulevard, Garden Grove, California 92840.

79.     In or around 2014, DirecTV's authorized representative entered the beauty salon and spoke with Ms. Perez.  The individual represented that he was acting on behalf of DirecTV and told Ms. Perez that DirecTV was offering a promotional deal which would provide her business with satellite cable television services for twenty-seven dollars and fifty cents ($27.50) a month for two (2) years.

80.     All communications with the DirecTV representative were in Spanish.

81.     As a result of DirecTV's representation, Ms. Perez was interested in

- 20 -

THIRD AMENDED CLASS ACTION COMPLAINT

purchasing the DirecTV promotional deal – which included Spanish-language channels – for her business because she wanted something for her customers to watch on television while they were in the beauty salon. Ms. Perez thought that the deal offered by DirecTV was a good one, and therefore agreed to purchase the DirecTV promotional deal to provide her business with satellite cable television services from DirecTV for twenty-seven dollars and fifty cents ($27.50) a month for two (2) years.

82.    DirecTV never advised Ms. Perez that the satellite cable television services from DirecTV would be provided to her business under a residential account; nor did Ms. Perez ever ask that the satellite cable television services from DirecTV be provided to her business under a residential account. Instead, based solely upon the representations from Defendants and the fact that those discussions had taken place inside the beauty salon, Ms. Perez relied upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account. Ms. Perez relied upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account. This reliance is what induced Ms. Perez to provide Defendants with her personal information and bank information.

83.    Ms. Perez was not provided with – nor did she sign – a contract, agreement, notice or any other document related to the DirecTV promotional deal, either at the time of installation or at any time thereafter. Ms. Perez never signed a contract of any kind to provide her business with satellite cable television from DirecTV for twenty-seven dollars and fifty cents ($27.50) a month for two (2) years, at the time she agreed to purchase the DirecTV promotional deal. Ms. Perez was only asked to provide her personal information and her bank account information to Defendants.

84.    Ms. Perez was never advised that the satellite cable television services from DirecTV would be provided to her business under a residential account.

THIRD AMENDED CLASS ACTION COMPLAINT

Similarly, Ms. Perez never attempted to solicit, request, or direct that the satellite cable television services from DirecTV be provided to her business under a residential account. Based upon the representations of DirecTV and the fact the physical installation was inside the beauty salon, Ms. Perez relied upon DirecTV Defendants to provide her business with satellite cable television services from DirecTV under the correct type of account. Thereafter, the only documents related to the DirecTV promotional deal which Ms. Perez ever received were an Equipment Lease Agreement in English and the monthly invoices from DirecTV, which were sent to "2127 West Dogwood Avenue, Anaheim, California 92801." The monthly invoices did not state whether the account was commercial or residential. (*See, e.g., the copy of the June 6, 2014, invoice from DirecTV attached hereto as* **Exhibit A**.)

85.     DirecTV's authorized representative, with whom Ms. Perez spoke, did not advise her that the satellite cable television services from DirecTV would be (or had been) provided to her business under a residential account; nor did Ms. Perez ever ask that the satellite cable television services from DirecTV be provided to her business under a residential account. Instead, based upon the fact that DirecTV had provided satellite cable television services to the salon for nearly two years, Ms. Perez continued to rely upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account.

86.     It was, therefore, much to Ms. Perez's surprise that she received a phone call in May 2015 from LLO, advising her they had been retained by DirecTV "regarding the unauthorized reception and commercial display of DIRECTV programming at your establishment in violation of the Federal Communications Act and DIRECTV customer agreements." Defendant LLO accused Ms. Perez of "defrauding" and making "misrepresentations" to DIRECTV. During the May 2015 phone call with Ms. Perez, LLO alleged that on April 8, 2015, an "independent auditor" had "observed and recorded your exhibition of DIRECTV programming" without authorization, and threatened prosecution and/or litigation if Ms. Perez did

THIRD AMENDED CLASS ACTION COMPLAINT

not contact the Lonstein Defendants within seven (7) days to resolve the matter.  Ms. Perez was informed that "they" were going to sue her for $75,000.00 for the unauthorized use of DIRECTV services.

87.   Ms. Perez tried to explain that the DirecTV representative that she was told she sought out from DirecTV services but that their representative came to her business soliciting a new commercial account and installed it the same day.  The LLO representative continued to accuse Ms. Perez of misrepresentation.

88.   Over the next month, almost on a daily basis, Ms. Perez received numerous telephone calls from a representative of Defendant LLO.  The individual always identified herself as DirecTV's attorney and threatened that if Ms. Perez did not pay $75,000.00, they would report her to collections and ruin her credit.  Ms. Perez took this to mean they were claiming she owed a debt to DirecTV.  Ms. Perez continued to protest her innocence and maintain she did not owe them $75,000.00.  LLO disregarded Ms. Perez's claims and repeated the accusations over and over.

89.   After several calls, LLO lowered the demand to $50,000.00.  Ms. Perez again refused to pay.  The LLO representative was adamant, growing angrier with each call and becoming increasingly more threatening.  Ms. Perez was sent through the mail, a photograph, which Defendants LLO claim was "proof" Ms. Perez was misappropriating DirecTV programming at her beauty salon.  The photo was a grainy, still photo of a television screen with unrecognizable content.

90.   After over a month of nearly daily phone calls and threats, LLO told Ms. Perez if she paid $5,000.00 in installments, they would not take any further action.  Ms. Perez was told this was the last and final "offer."

91.   Ms. Perez received a letter, dated June 26, 2015, (the "June 26, 2015, letter") on the letterhead of the Lonstein Law Office, P.C., with an attached proposed settlement agreement.  In the proposed settlement agreement, LLO alleged that Ms. Perez's business had used the satellite cable television services of DirecTV without authorization and threatened prosecution and/or litigation if Ms. Perez did not pay

- 23 -

1   $5,000.00. (*See copy of the June 26, 2015, letter and proposed settlement agreement*
2   *attached hereto as* **Exhibit B**.)

3       92.    As a result of being misled and fraudulently induced into agreeing to
4   pay $5,000.00 in order to resolve her alleged outstanding balance with DirecTV, Ms.
5   Perez began making monthly payments of $500.00 to LLO via wire transaction. It is
6   unclear what percentage of this amount was paid to DirecTV. (*See July 2, 2015,*
7   *credit card receipt; August 7, 2015, letter; August 7, 2015, credit card receipt;*
8   *American Express Authorization Form; and June 1, 2016, statement attached hereto*
9   *as* **Exhibit C**.) This agreement is voidable and unenforceable.

10       93.    The above-described conduct by Defendants in their transactions with
11   Ms. Perez are the same and/or substantially similar to the course of conduct engaged
12   in by Defendants in their transactions with numerous other small business owners in
13   California who are similarly situated to Ms. Perez.

14       94.    Plaintiff is informed and believes that other minority business owners
15   across the United States have been victims of the Scheme.   In Florida, on or around
16   June 2018, a Signal Auditing auditor/investigator signed a sworn affidavit claiming
17   to have observed the 2018 Stanley Cup Final on the restaurant Novecento's
18   televisions. This affidavit is a sham and is false because the Stanley Cup Finals were
19   not held on June 5, 2018.

20       95.    A small bar in Nashville, Tennessee was targeted by Signal Auditing in
21   September 2018 whereby the auditor/investigator admits to changing the channel
22   and viewing a purported DirecTV channel even though DirecTV programming was
23   not being broadcast in the commercial establishment upon arrival.   This form of
24   entrapment is not isolated.

25       96.    These and other examples demonstrate the Scheme has continued and
26   is remains pervasive and will continue.

27
28

THIRD AMENDED CLASS ACTION COMPLAINT

## COUNT I

### (Racketeer Influenced and Corrupt Organizations Act)

97.    Plaintiff re-asserts and incorporates by reference each and every allegation set forth in the preceding paragraphs as though set forth at length herein.

98.    RICO further provides that, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt." (18 U.S.C. § 1962(c).)

99.    RICO also provides that "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." (18 U.S.C. § 1962(d).)

100.    At all relevant times, Defendants were natural persons and corporate entities, and are therefore "persons" within the meaning of 18 U.S.C. § 1961(3).

101.    Upon information and belief, Lonstein Law Office and the natural persons employed thereby (Julie Lonstein and Wayne Lonstein); Signal Auditing and DirecTV comprise of three distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4). Each and every natural person and/or corporate entity is associated with the enterprise.

102.    Upon information and belief, each group of defendants, the Lonstein Law Office and the nature persons employed thereby (Julie Lonstein and Wayne Lonstein); Signal Auditing and DirecTV also qualify as separate and distinct enterprises within the meaning of 18 U.S.C. § 1961(4). Each and every Lonstein defendant is employed by or associated with the Lonstein Law Office enterprise; each Signal Auditing defendant is employed by or associated with the Signal Auditing enterprise; and each DirecTV defendant is employed by or associate with the DirecTV enterprise.

103.    Collectively, upon information and belief, the individuals and entities

- 25 -

THIRD AMENDED CLASS ACTION COMPLAINT

that constitute the Lonstein Defendants, the Signal Auditing Defendants and the DirecTV Defendants constitute an association-in-fact within the meaning of 18 U.S.C. ¶ 1961(4).

104.   As set forth herein above the purpose of the enterprise/enterprises (the "Enterprise") is to defraud and extort purported "settlements" and increase DirecTV's commercial accounts from innocent consumers threatened with sham litigation resulting from entrapment and/or false claims of a debt owed. This is accomplished by the Defendants by targeting small businesses for unsolicited sales campaigns and wrongfully providing them residential service in commercial establishments known to be commercial establishments at the time of the sale; the Signal Auditing Defendants engaging in surreptitious "investigation" of these businesses at the direction of the Lonstein and DirecTV Defendants; and the Lonstein Defendants engage in threatening communications intended to scare these small business consumer victims into paying "settlements" and agreeing to lengthy commercial contracts with the threat of sham litigation involving allegations of violations of the Communications Act of 1934 claiming Plaintiff and Plaintiff Class engaged in the theft of DirecTV programming.  The enterprise was formed for the purpose of extorting settlement money from unsuspecting business owners/consumers, increasing through fraud DirecTV's business accounts for which it charges higher rates and enriching all Defendants.  The Scheme sets up business owners/consumers to be later accused and threatened with prosecution for violations of the Communications Act, 29 U.S.C. § 605 based on Defendants' false accusations of theft of DirecTV services levied against the small business owners accusing them of broadcasting residential DirecTV programming in a commercial establishment.

105.   The Enterprise has been in engaged in, and continues to be in engaged in, activities that affect interstate commerce. Defendants' unlawful Enterprise in violation of RICO has been and remains longstanding, continuous, and open-ended.

106.   Defendants, individually and collectively, as an Enterprise, have

- 26 -

THIRD AMENDED CLASS ACTION COMPLAINT

engaged, directly or indirectly, in a pattern of racketeering activity and have, therefore, violated 18 U.S.C. § 1962(c).

107. Defendants' Extortion Scheme includes, but is not limited to:

a. **Mail Fraud:** Defendants violated 18 U.S.C. § 1341, by sending or receiving or causing to be sent or received, materials via email, U.S. mail or commercial interstate carriers for the purpose of executing the Scheme, which amounts to a material scheme to defraud and obtain money on false pretenses, misrepresentations, and/or omissions. Defendants' use of mail formed a central feature of the scheme and included communications by form letters from LLO on LLO letterhead listing the Lonstein Defendants as attorneys, and includes the alleged "evidence" provided by Defendants Signal Auditing in the form of a "Site Inspection," created by the Signal Auditing auditor at the direction of LLO, mailed to class member targets of the Scheme, and the series of follow up notices mailed to class members who did not fully pay the demanded amounts in response to the initial letter as described herein. In addition, class member victims were instructed by Defendants to send payments demanded either by wire as discussed below or by certified check through the U.S. Mail.

b. **Wire Fraud**: Defendants violated 18 U.S.C. § 1343, by transmitting, receiving or causing to be transmitted or received materials and monies by wire for the purpose of executing the Scheme to defraud and obtain money on false pretenses, misrepresentations and/or omissions. Defendants instructed Plaintiff and class members to make payments through the use of interstate wire communications in violation of 18 U.S.C. §

- 27 -

THIRD AMENDED CLASS ACTION COMPLAINT

1343.  The materials transmitted and/or received, include, but are not limited to, interstate credit card or bank transactions, emails to the target business owners, ACH debit transactions, and/or PayPal wire transmission to Defendants LLO which then such proceed split is then transmitted via wire and/or check to the other Defendants.  On information and belief, Plaintiff alleges, all participants in the Scheme transmit and share information through an online web-based portal that can be accessed by all Scheme participants. Defendant Signal Auditing uses the portal to obtain the DirecTV "Legal Lists" and where the auditors/investigators transmit or upload site inspections showing "hits".  LLO accesses the portal to determine which small business owners to target with emails, letters and calls to obtain the Scheme proceeds.   Upon information and belief, Plaintiff further alleges Scheme proceeds are distributed to Scheme participants through wire transfers and/or U.S. Mail.

108.   Defendants have used email, U.S. mail and wires in connection with every small business target and subsequently "audited," and each use of the mails and wires has furthered the fraudulent Scheme and enables Defendants to take money and property from Plaintiff and putative class members by means of false pretenses and representations

109.   Defendants violated 18 U.S.C. § 1962(d) by conspiring to engage in racketeering activity.

110.   Defendants, individually and jointly, as part of an enterprise, agreed to commit more than two racketeering acts, with knowledge that the objective was unlawful and intended to further that unlawful objective. The multiple acts of racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued

THIRD AMENDED CLASS ACTION COMPLAINT

racketeering activity, and therefore constitute a "pattern of racketeering activity."

111.   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1), include wire fraud and mail fraud as described herein to perpetuate the Scheme described herein: (a) targeting and soliciting small business owners to purchase satellite cable television services from DirecTV at a "special" price or rate; (b) establishing a residential satellite cable television service account for the small businesses although Defendants knew or should have known that the small business owners intended to use those services in their businesses; (c) providing satellite cable television to small businesses under residential accounts although the small business owners relied upon Defendants to provide commercial services; (d) deliberately and specifically targeting small business owners for a "signal audit" based on a pre-determined finding that the small business owners had "pirated" or "stolen" satellite cable television services from DirecTV; and (e) threatening the small business owners with repeatedly factual and legal misrepresentations in the form of claims of amounts actually "owed", threats of damage to credit profile, threats of sham prosecution and/or costly legal action, threatening prosecution in an action involving violations of the Communications Act of 1934, all undertaken in order to extort an unreasonable and unconscionable "settlement" from them and increase DirecTV's lucrative commercial accounts.  The predicate acts by the Enterprise have continued from at least 4 years prior to the filing of this action, during the pendency of this action and based on information and belief, will continue.  Small business owners from various cities and states throughout the United States continue to be victimized by Defendants through this Scheme.

112.   Defendants' predicate acts of racketeering amount to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions.

113.   Defendants   knowingly   and   intentionally   made   these misrepresentations, acts of concealment and failures to disclose. Defendants either

knew or recklessly disregarded that these were material representations and omissions. Defendants, and all of them, participate in the Scheme designed to collect from unsuspecting small business owners/consumers an unlawful debt.

114.   Plaintiff and those similarly situated to her have suffered harm and have been injured from Defendants' violations of RICO in the amount of the unexpected increased monthly fees, forced continued subscriber status, indebtedness, settlement payments, either paid or to be paid, constituting overpayment for services and an injury to property. In the absence of Defendants' violations of 18 U.S.C. § 1962, Plaintiff and the Class would not have incurred these concrete financial losses.

115.   Plaintiff's and the Classes' injuries were directly and proximately caused by Defendants' racketeering activity.

116.   Defendants knew and intended that Plaintiff and the Class would rely on the Scheme's fraudulent representations and omissions. Defendants knew and intended Plaintiff and the Class would pay monies to Defendants as a result of threat of sham litigation and misrepresentations of the ramifications if Plaintiff and the Class did not pay.

117.   Plaintiff's and the Classes' injuries were directly and proximately caused by Defendants' racketeering activity.

118.   Defendants knew and intended that Plaintiff and the Class would rely on the Scheme's fraudulent representations and omissions. Defendants knew and intended Plaintiff and the Class would pay monies to Defendants as a result of same.

119.   Plaintiff and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to 18 U.S.C. § 1964(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, demands judgment against Defendants as follows:

THIRD AMENDED CLASS ACTION COMPLAINT

1.     An order certifying the Class for money damages under Federal Rules of Civil Procedure Rule 23, and appointing Plaintiff as Class Representative and appointing her attorneys as Class Counsel;

2.     Order Defendants to engage in a corrective notice campaign, and requiring Defendants to refund to Plaintiff and all Class Members the funds paid;

3.     An accounting of all amounts that Defendants collected from Plaintiff and Class Members as a result of the Scheme;

4.     A judgment for actual damages;

5.     A judgment for compensatory damages;

6.     A judgment for treble damages under RICO;

7.     A judgment for reasonable attorney fees and costs of suit in connection with this action, pursuant to the RICO [18 U.S.C. §1964(c)], California Civil Code 1021.5 and any other applicable statute;

8.     A judgment for pre-judgment and post-judgment interest; and/or

9.     A judgment for all such other and further relief as the Court deems equitable and just.


Dated: January 16, 2020

**MAHONEY LAW GROUP, APC**

**LISA L. CAY, ATTORNEY AT LAW**


*/s/Kevin Mahoney*
Kevin Mahoney
Katherine J. Odenbreit
Atoy H. Wilson
Lisa L. Clay
Attorneys for Plaintiff, DONEYDA PEREZ, and on behalf of all others similarly situated

- 31 -
THIRD AMENDED CLASS ACTION COMPLAINT

1
2
3
4                              **JURY DEMAND**

5        Plaintiff demands a trial by jury on all issues subject to trial.

6
7   Dated: January 16, 2020
8            **MAHONEY LAW GROUP, APC**

9                 **LISA L. CAY, ATTORNEY AT LAW**

10
                  */s/Kevin Mahoney*
11                Kevin Mahoney
12                Katherine J. Odenbreit
                  Atoy H. Wilson
13                Lisa L. Clay
14                Attorneys for Plaintiff, DONEYDA PEREZ, and
                  on behalf of all others similarly situated
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD AMENDED CLASS ACTION COMPLAINT