Kevin Mahoney (SBN: 235367)
kmahoney@mahoney-law.net
Katherine J. Odenbreit (SBN: 184619)
kodenbreit@mahoney-law.net
**MAHONEY LAW GROUP, APC**
249 East Ocean Blvd., Suite 814
Long Beach, CA  90802
Telephone: (562) 590-5550
Facsimile: (562) 590-8400

Attorneys for Plaintiff DONEYDA PEREZ, DANNY NISSEN, MARLYS
NISSEN, JOSEPH ANGELO, GREGORY LAPLANTE and PAUL HOLT,
individually and on behalf of their respective businesses, and on behalf of all
others similarly situated
[additional counsel below]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| DONEYDA PEREZ as an individual and on behalf of all others similarly situated, | Case No.: 8:16-CV-01440-JLS-DFM |
| Plaintiff, | **FOURTH AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | Assigned for All Purposes to: Hon. Josephine L. Staton; Dept. 10A |
| DIRECTV GROUP HOLDINGS, LLC, a Delaware Corporation, LONSTEIN LAW OFFICES, P.C., a New York Professional Corporation; SIGNAL AUDITING, INC., a New York Corporation, JULIE COHEN LONSTEIN and WAYNE M. LONSTEIN, | Complaint Filed:   August 4, 2014 Trial Date:   None Yet Set **REQUEST FOR JURY TRIAL** |
| Defendants. | |

- 1 -

Lisa L. Clay (*Pro Hac Vice*)
lisa@clayatlaw.com
Lisa L. Clay, Attorney at Law
2100 Manchester Road, Suite 1612
Wheaton, IL 60187
Telephone: (630) 456-4818

FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs DONEYDA PEREZ, individually and on behalf of Oneida's Beauty and Barber Salon, ("Perez"), Marlys Nissen and Danny Nissen, individually and on behalf of Mo's One More Lounge (the "Nissens"), Joseph Angelo, individually and on behalf of Stuft Surfer Café, Inc. ("Angelo"), Gregory G. Laplante, individually and on behalf of G and G Smog Test Center dba G and G Smog ("Laplante") and Paul Holt, individually and on behalf of 4 Dice Restaurant ("Holt"), (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, complains and alleges as follows:

## NATURE OF THE CASE

1.     This is a putative class action brought on behalf of Plaintiffs Doneyda Perez, Marlys and Danny Nissen, Joseph Angelo, Gregory G. Laplante and Paul Holt, individually and on behalf of their respective businesses, and all others similarly situated arising from the scheme to defraud and extort purported "settlements" from innocent consumers threatened with sham litigation resulting from entrapment (hereinafter the "Scheme"), perpetrated by Defendants DIRECTV GROUP HOLDINGS, LLC, DIRECTV, LLC, and DIRECTV Holdings, LLC,(collectively "DirecTV"), LONSTEIN LAW OFFICES, P.C. ("LLO"), SIGNAL AUDITING, INC. ("Signal Auditing"), JULIE COHEN LONSTEIN ("J. Lonstein") and WAYNE M. LONSTEIN ("W. Lonstein") (hereinafter collectively referred to as "Defendants").

2.     Defendants have, and continue to engage in, a Scheme and course of conduct in which the owners of small businesses in the United States are the focus of unsolicited sales campaigns from DirecTV, through its employees and independent contractor salespeople and/or installers to sell satellite cable television services.  When a small business owner purchases DirecTV services, they are often unwittingly provided with residential service accounts even when they specifically request a commercial account or when the DirecTV representative solicits service in their business location for their business. DirecTV and/or its agents do not provide

the business owners with any written contracts, agreements, notices, or other documents regarding the type of satellite cable television services which they have purchased, in part to hide the fraudulent nature of the Scheme.

3.     Despite DirecTV having been the subject of a nationwide investigation into questionable marketing and sales tactics, resulting in a consent decree with 48 Attorneys General, these practices continue to this day.

4.     Small business owners like Plaintiffs do not solicit, request or direct that the satellite cable television services which they have purchased be provided under a residential account; rather, they rely upon Defendant DirecTV and its authorized agents to provide the satellite cable television services which they have purchased for their business under the proper type of commercial accounts.

5.     Without the business owners being made aware, DirecTV designates the accounts as "residential," despite the fact that DirecTV and/or its agents solicit small business owners like Plaintiffs, and those similarly situated in their business establishments, for business services.

6.     DirecTV does no internal audits of these small business installations. To the contrary, DirecTV relies completely on the information obtained from its thousands of employees, agents, and independent contractor agents to set up the DirecTV account. Despite the fact that order forms, customer agreements, and other documents provided to the small business customer make no reference to the residential nature of the account, DirecTV does nothing to verify that the customer has received the requested account. Rather, without investigation, DirecTV presumes that any small business customer with a residential account is illegally stealing from DirecTV, and uses that improper assumption to engage in the Scheme described herein.

7.     The Defendants' Scheme is engendered by the Communications Act, which provides for terrifyingly-high looking statutory damage awards and the provision for an award of attorneys' fees to the "aggrieved party" which can only be

the plaintiff, or in this case DirecTV, with no mutual provision for the innocent defendant (business owner) who succeeds in defending him/herself. The Communication Act is therefore rife for abuse by these and plaintiffs that rely on similar schemes.

8.    Defendants perpetrate the Scheme using interstate wire and mails threatening sham litigation as follows:

a.    DirecTV and Lonstein Law Office ("LLO") have a long-standing contingency model arrangement: DirecTV, LLO and Signal Auditing perpetuate the Scheme described herein and share in the profits;

b.    LLO created Signal Auditing solely for the purpose of funneling audits to a captive entity that it could control, and from which it could profit. Signal Auditing is owned, managed, and controlled by J. Lonstein and W. Lonstein. It maintains no contractual relationship with LLO and recognizes no corporate formalities that distinguish it from LLO other than incorporation, which is a minor formality. In all other respects it is a captive arm of LLO. Its primary, if not only purpose, is to conduct audits related to this Scheme or schemes of a similar nature; and

c.    DirecTV installs the satellite cable television services and defines the account improperly as residential and not commercial.

9.    DirecTV provides to Scheme participants/agents Signal Auditing, LLO, J. Lonstein, and/or W. Lonstein a list of authorized commercial establishments (the "Legal List") on a weekly, bi-weekly, or monthly basis. The Legal List is updated by DirecTV and provided to Scheme participants Signal Auditing, LLC, J. Lonstein, and/or W. Lonstein on a weekly, bi-weekly, or monthly basis. Scheme participant/agent Signal Auditing, overseen by Scheme participant/agents LLO, J.

Lonstein, and/or W. Lonstein, employs contract "auditors/investigators" to gather "evidence" of the purported commercial use of residential accounts. Signal Auditing's involvement in the Scheme is to provide these "auditors/investigators" to Scheme participant/agents LLO, J. Lonstein, and W. Lonstein for purposes of entrapping unsuspecting victims. Signal Auditing agents are directed and controlled by LLO, J. Lonstein, and W. Lonstein.

10.    Scheme participants/agents Signal Auditing, LLO, J. Lonstein, and/or W. Lonstein distribute the Legal List from DirecTV to their employee/agent auditors/investigators, who are instructed *not* to surveille establishments or provide audit reports regarding establishments on that list. Instead, they are told to locate small business establishments that are *not* on the Legal List, and provide an "auditor report" – a form that indicates "proof" of the alleged violation.  Plaintiffs are informed and believe DirecTV and/or Signal Auditing provided auditors with the names or general locations of businesses to target. Upon information and belief, Defendant members of the Scheme work in concert to target minority business districts where DirecTV installers have previously solicited.  This information is sought out by Defendant Signal Auditing by trolling minority-owned small business districts actively looking for "violations".  If the auditor/investigator locates a target small business that is not on the Legal List but is displaying DirecTV programming, the Signal Auditing auditor/investigator clandestinely obtains photographs and/or video recordings which purport to show that the business in question is using residential satellite cable television services in a commercial establishment. In some circumstances, Defendant Signal Auditing will enter a business posing as a paying patron and ask to change the TV channel to find a purported DirecTV program even if such programming is not currently being broadcast at the time of the visit.

11.    The auditor/investigator then provides Signal Auditing/LLO "evidence" on a form affidavit drafted by Signal Auditing and/or LLO.  Payment to the auditor/investigator is made only if the auditor/investigator provides a "hit" – i.e.

their signature on the form affidavit indicating a "violation". In other words, they are not paid unless they find a purported violation.

12.     Scheme participants LLO, Signal Auditing, J. Lonstein, and/or W. Lonstein then forward the auditor/investigator "hits" back to DirecTV so that DirecTV can confirm that the hit represents an allegedly improper residential account in a commercial establishment.

13.     Prior to AT&T owning DirecTV, i.e. at some of the time material hereto, and at the time these Plaintiffs were harmed, DirecTV did not pay for audit hits unless there were proceeds for the Scheme participants to share. Said another way, Signal Auditing did not invoice DirecTV for auditor/investigator hits. Instead, the cost of those hits was deducted by LLO from the proceeds of the Enterprise.

14.     If there are no Scheme proceeds, prior to the AT&T takeover of DirecTV, Scheme participants/agents LLO, Signal Auditing, J. Lonstein, and W. Lonstein had to absorb the cost of any hit that did not result in Scheme proceeds. After the takeover by AT&T of DirecTV, and after this action was filed, upon information and belief, Signal Auditing "invoices" DirecTV for all hits, likely to provide the Scheme some appearance of legitimacy.

15.     DirecTV then authorizes LLO to open a new file and begin extortion efforts.

16.     LLO does nothing independently to verify whether DirecTV records are correct, whether the account was directly solicited by DirecTV, and the only due diligence done prior to initiating Scheme extortion efforts is to verify that LLO is contacting the appropriate individuals/owners of the business.

17.     LLO then launches a campaign of emails, telephone calls and threatening, intentionally vague, and exaggerated demand letters to innocent small business owner consumers threatening an action against them for violating the

federal Communications Act of 1934.[1] These business owners are told they have "defrauded" DirecTV, "owe" DirecTV tens of thousands of dollars; they are misled about the strict liability, intent and knowledge components of the statute, and are threatened with ruined credit and lawsuits.  LLO's only reason for not pursuing a small business owner consumer is if they learn the consumer is in bankruptcy or unable to pay, or if the consumer threatens legal action (i.e. counterclaims or class action claims).

18.    Defendants' threatened legal actions are a sham because: (1) DirecTV installed the residential services at a business and knows the programming is being shown at the business; (2) Despite knowing this; Signal Auditing, LLO, and the Lonsteins make misrepresentations of fact and law in their threatening communication with these victims; and (3) LLO and the Lonsteins have no intention of actually filing litigation, but will threaten to do so for tactical purposes, to instill fear and increase the Scheme proceeds.

19.    The only purpose of LLO and Lonsteins' calls and demand letters is to frighten innocent small business owners into paying settlement demands that are made solely for the purpose of extorting by fraud a sum of money the innocent victim will believe is a better outcome than having to defend the litigation or repair their credit;

20.    The demand letters, emails and telephone calls start with outrageous monetary demands for alleged "damages" and attorney's fees, usually between $25,000.00 - $100,000.00.

21.    After LLO has sufficiently terrified the small business owners, LLO offers the consumer a "choice:" (1) pay a lump sum of money (usually between

---

[1] J. Lonstein referred to these demand letters in a 2018 deposition as "claim letters," that "invite the presumed pirate to please contact us to discuss the facts and circumstances of this allegation of commercial misuse." J. Lonstein also testified at that same deposition that any consumer who suggested they had requested a commercial account but been provided a residential account would be referred back to DirecTV for "investigation," but could provide no details regarding what, if any investigation ever takes place.

FOURTH AMENDED CLASS ACTION COMPLAINT

$10,000.00 - $20,000.00) or (2) pay a lower lump sum (usually between $5,000 - $10,000.00) **and** sign up for a lengthy commitment as a DirecTV commercial customer for a higher monthly cost[2];

22.    In the rare case that a lawsuit is actually filed against those business owners who refuse to pay, that litigation is a sham because the claim is based on the known false premise the small business owner has had unauthorized access to DirecTV services, among other false misrepresentations of fact and law as identified herein, when it is DirecTV who set up the customer for the threatened litigation by purposely misleading the consumer and installing residential services in a commercial establishment under false pretenses.   Further, the account origin (business or residential solicitation) is easily identifiable by DirecTV, LLO and Signal Auditing (through LLO and/or DirecTV).

23.    Utilization of Defendant Signal Auditing allows the enterprise to function more effectively given that "audits" would typically be performed by an uninterested third party with no financial stake in the discovery of an alleged pirated signal. Defendant Signal Auditing advertises to those who use its service a 4-step process to complete the audit which includes: Identifying the offender, allowing the offender to pay a fee (through LLO and Lonstein), covert the offender to a subscribing "good faith" customer (converting to a DirectTV commercial account), and prosecuting nonpaying "offenders".[3]  This outline actually describes the Scheme in part and shows how all of the Defendants are intertwined and crucial to perpetuating the Scheme.

---

[2] By requiring a lengthy term contract, DirecTV avoids many of the loopholes that both residential and commercial consumers use – agreeing to "promotional" packages and then cancelling as soon as the promotion expires.  Further, it allows DirecTV to increase its profits by turning lower residential rate accounts into longer term higher rate business accounts which the customer may have declined originally if the higher rates were disclosed.

[3] http://www.signalauditing.com/piracy-solutions

FOURTH AMENDED CLASS ACTION COMPLAINT

24.     Defendants do not confine themselves to minority small business owners, however, they target minority small business owners with the belief that such owners are less likely to dispute or challenge the allegations because they are unable by virtue of smaller profit margins to mount a vigorous defense or seek immediate legal counsel.

25.     Thus, in addition to the monthly fees already paid by the small businesses for the satellite cable television services, Defendants have obtained thousands, if not millions of dollars in Scheme proceeds paid to Defendants as "settlements," by the small business owners who have been their victims and DirecTV has gained millions of dollars in additional commercial accounts improperly obtained by fraud and are therefore voidable and unenforceable.

26.     Due to their course of conduct, Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

27.     Plaintiffs therefore seek monetary damages under RICO, on behalf of themselves, and all others similarly situated within the United States.

## THE PARTIES

28.     Plaintiff Doneyda Perez ("Perez") is an individual who at the time this action was filed, resided in Anaheim, California and now resides in Katy, Texas. Ms. Perez was the sole owner of Oneida's Beauty and Barber Salon, a beauty salon located at 12342 Harbor Boulevard, Garden Grove, California 92840.

29.     Plaintiffs Danny and Marlys Nissen ("Nissens") are individuals who reside in Waterloo, Iowa. The Nissens are the joint owners of Mo's One More Lounge located at 4515 E. Washburn Road, Washburn, IA 50706.

30.     Plaintiff Joseph Angelo ("Angelo") is an individual who resides in Newport Beach, California. Mr. Angelo is the sole owner of Stuft Surfer Café located at 101 15th Street, Newport Beach, CA 92663.

31.     Plaintiff Gregory G. Laplante is a resident of Redlands, California. Mr. Laplante is the sole owner of G and G Smog Test Center dba G and G Smog located

at 460 Tennessee Street, Redlands, CA 92373.

32. Plaintiff Paul Holt is a resident of Fordyce, Arkansas. He is the owner of 4 Dice Restaurant located at 1990 N. Highway 79, #167, Fordyce, AR 71742.

33. Defendant DIRECTV, LLC was a Delaware corporation whose principal place of business was 2230 East Imperial Highway, El Segundo, California. DIRECTV, LLC issued bills to DIRECTV subscribers.

34. Defendant DIRECTV Holdings, LLC was a Delaware limited liability company and had its principal place of business at 2230 East Imperial Highway, El Segundo, California. It was the U.S. operating arm of DIRECTV, Inc.

35. In 2014, AT&T announced a merger to acquire DIRECTV, Inc. DIRECTV, LLC and DIRECTV Holdings LLC. In or around June 2015, pursuant to the merger, DIRECTV, LLC, DIRECTV, Inc. and DIRECTV Group Holdings were merged into Steam Merger Sub, LLC, a subsidiary of AT&T and subsequently renamed DIRECTV Group Holdings, LLC.

36. DIRECTV Group Holdings, LLC is a Delaware limited liability company whose principal place of business is 675 W. Peachtree Street, N.W., Suite 2756, Atlanta Georgia.  Defendant DIRECTV Group Holdings, LLC is a successor-in-interest to most if not all DIRECTV entities.

37. Defendants DIRECTV, LLC, DIRECTV Holdings, LLC, and DirecTV Group Holdings, LLC are collectively referred to as ("DirecTV")

38. At all times relevant hereto, Defendant DirecTV was and is engaged in the business of acquiring, promoting, selling, and distributing digital entertainment (*i.e.*, broadcast and premium television programming), primarily through satellite transmission to residential and commercial subscribers throughout the United States and issue bills to commercial and residential subscribers.

39. Defendant Lonstein Law Office, P.C. ("Defendant LLO"), is a professional corporation organized under the laws of the State of New York.  At all times relevant hereto, the Lonstein Law Office, P.C. was, and is, a law firm retained

by DirecTV to, *inter alia*, prosecute alleged thefts by small businesses in California of the satellite cable television services of DirecTV. Julie Cohen Lonstein and Wayne Lonstein are the named partners of LLO.

40.    Defendant Julie Cohen Lonstein ("Defendant J. Lonstein"), is an individual who is licensed to practice law in the State of New York, and is a partner with the Lonstein Law Office, P.C.  At all times relevant hereto, Defendant Lonstein is, and was, lead counsel for Defendant Signal Auditing and listed as "co-inventor" on the patent application Defendant Signal Auditing has filed relating to its allegedly proprietary methods of detecting signal piracy.

41.    Defendant Signal Auditing, Inc. ("Signal Auditing"), is a corporation organized under the laws of the State of New York and maintains its principal place of business in Ellenville, New York. The address listed for Defendant Signal Auditing, Inc. is the same address as Defendant Lonstein Law Office. At all times relevant hereto, Signal Auditing was and is engaged in the business of nationwide auditing of commercial and residential piracy of telecommunication subscribers, as overseen by Defendant Lonstein.

42.    Defendant Wayne Lonstein ("Defendant W. Lonstein"), is an individual who is licensed to practice law in the State of New Jersey, Pennsylvania, and Massachusetts.  At all times relevant hereto, Defendant W. Lonstein is, and was, lead counsel for Defendant Signal Auditing and listed as "co-inventor" on the patent application Defendant Signal Auditing has filed relating to its allegedly proprietary methods of detecting signal piracy.

## JURISDICTION AND VENUE

43.    This action arises under the laws of the United States.  This Court has original jurisdiction over the subject matter of this action pursuant to both U.S.C. § 1964, which entitles the Court to hear claims brought under 18 U.S.C. § 1962, and also pursuant to 28 U.S.C. § 1331, which gives the court jurisdiction over actions that arise under the laws of the United States.

FOURTH AMENDED CLASS ACTION COMPLAINT

44.     This Court has personal jurisdiction over Defendants because they have significant minimum contacts with this State, and intentionally availed themselves of the laws of California by transacting a substantial amount of business throughout the State and this District, including, but not limited to, the promotion, marketing, advertising, and sale of cable television services by DirecTV throughout the Central District of California, Southern Division.

45.     Venue is proper in this Court under 28 U.S.C. § 1391(b). Plaintiffs Perez (when the action was filed) and Angelo reside in the Central District of California, Southern Division; Plaintiff Laplante resides within the jurisdiction of the Central District of California; and Defendants are located in, and do business in, the Central District of California, Southern Division.  A substantial number of the events that are the subject of this Complaint took place in the Central District of California, Southern Division.

## RICO FACTUAL ALLEGATIONS

46.     DirecTV maintained authorized sales representatives throughout the United States instructed by DirecTV to solicit small businesses and install DirecTV equipment and services.

47.     Defendant Signal Auditing conducts audits nationwide on behalf of DirecTV and/or LLO, J. Lonstein and W. Lonstein.  J. Lonstein and W. Lonstein act as corporate counsel for Defendant Signal Auditing.

48.     At all times relevant hereto, Defendants J. Lonstein, W. Lonstein, Signal Auditing, and LLO acted for, or on behalf of, DirecTV in undertaking the acts and/or omissions alleged herein.

49.     The "Scheme" begins with DirectTV and its representatives targeting and soliciting small, primarily minority-owned and small businesses to purchase DirectTV satellite cable services at a "special rate" to broadcast in their commercial establishment.  After the business owner agrees to purchase DirectTV services, the equipment   is   installed   at   their   place   of   business   by   DirecTV   authorized

FOURTH AMENDED CLASS ACTION COMPLAINT

representatives.  DirectTV then internally designates the account as "residential." DirecTV then provided to Scheme participants Signal Auditing and/or LLO of a "Legal List" of DirecTV customers who *should not* be targeted for investigation.

50.     Based on the "Legal List" and at the direction of Scheme participants DirecTV, LLO and Signal Auditing, upon information and belief that Signal Auditing auditors/investigators are provided with the names or general locations of businesses to target.

51.     If an auditor/investigator is successful in locating a "hit", LLO and/or Signal Auditing provide the auditor/investigator affidavit to DirecTV.  Signal Auditing transmits the "Site Inspection" or "hit" to LLO.  The "hit" is directed back to DirecTV so that DirecTV can confirm its records list the account as "residential".

52.     Scheme participants LLO and Lonstein, initiate telephone calls and letters sent through email, the U.S. Mail and Wire to threaten these small business owners with credit reporting, "owed" debts, and sham litigation unless they pay outrageous sums of money.

53.     Through LLO and Lonstein, business owners are offered two choices: (1) pay a high flat rate ($25,000-$100,000 or more) and be "done with the matter", or; (2) pay an amount a lesser flat amount **and** sign up for an extended contract for DirectTV commercial account paying a higher monthly rate on a continuous basis. When a small business owner refuses to choose, Defendants Lonstein and LLO lower the amount and continue the barrage of calls until the small business owner relents.

54.     Plaintiffs are informed and believe LLO and Lonstein rarely, if ever, follow through with actual litigation because the threat of litigation is a sham to secure payment from the business owners and additional commercial accounts for DirecTV.

55.     Those customers who did/do pay were/are required to sign an agreement to transmit electronically (wire), either directly through an online

- 14 -

FOURTH AMENDED CLASS ACTION COMPLAINT

payment service, or a direct debit from their bank account to Defendant LLO. This Scheme is premised on fraudulent misrepresentations of fact by Defendant DirectTV to the business owner that they are signing up for an account for their business which DirectTV later contends is categorized by it as a residential account unbeknownst to the business owner. The Scheme continues with Defendant Signal Auditing's "audit" of the business and the "determination" that the business is unlawfully broadcasting DirectTV programming in a commercial establishment. That information is then passed onto DirectTV, LLO, and Lonstein.

56.    Finally, LLO and Lonstein, on behalf of DirectTV, make repeated factual and legal misrepresentations to the business owners in telephone calls and letters sent via U.S. Mail, falsely claiming that the business owners/victims have violated "state and federal law" and "owe" DirecTV and LLO money.

57.    The Scheme provides lucrative proceeds for the Scheme Defendants. The result of the activities of the Scheme provides substantial additional money and/or increased revenue for Scheme Defendant DirecTV from accounts converted to commercial at commercial rates; thousands, if not millions, of dollars in "settlement" amounts; fees paid to Defendant Signal Auditing for "discovering" the "piracy;" and substantial legal fees for Defendants J. Lonstein, W. Lonstein, and LLO in the form of their "cut" (40%) of the "settlement" amounts.

58.    This conduct occurred consistently throughout the United States from at least four years preceding the filing of the initial complaint in this matter and continues to the present. Complaints by business owners from around the country establish the continuous nature of the enterprise. Plaintiffs are informed and believe the Lonstein Defendants and DirectTV have collected millions of dollars from this Scheme. In 2015, Defendants LLO and Lonstein admitted via declaration, submitted by Julie Cohen Lonstein, that she, Defendant W. Lonstein, and their firm sent over 400 letters similar to the letters sent to Plaintiffs in this case in New Jersey alone during a six-year period to DirectTV subscribers similarly situated to Plaintiffs.

Therefore, the Scheme has been continuous and perpetuated by Defendants for many years and Plaintiffs are informed and believe it is continuing to date.

59. Defendants were knowingly and willing participants in the Scheme, and reaped revenues and/or profits therefrom.

60. Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, Defendants acting collectively engaged in activity constituting a violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud), the predicate acts. The racketeering activity was made possible by the regular and repeated use of the services and distribution channels of Defendant DirecTV, the auditing services of Defendants Signal Auditing and W. Lonstein and the legal services of Defendants Lonstein and LLO.

61. Defendants DirectTV, Lonstein, W. Lonstein, Signal Auditing, and LLO committed multiple "Racketeering Acts," as described herein, including aiding and abetting such acts.

62. The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.

63. In devising and executing the Scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343, in that they devised and knowingly carried out a material scheme or artifice to defraud or to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the Scheme, Defendants committed these Racketeering Acts, intentionally and knowingly, with the specific intent to advance the Scheme.

64. Other methods and means that Defendant DirectTV used to execute and perpetrate the Scheme include, but are not limited to, providing subscriber information that they know or should know may contain significant errors to

Defendants LLO, Lonstein, W. Lonstein, and/or Signal Auditing for the purpose of initiating an audit of targeted subscribers; utilizing agents to solicit small businesses for DirectTV services who misrepresent that the small business subscribers are obtaining a commercial account when they are designated by DirectTV as "residential subscribers;" and receiving collected funds electronically from Defendants Lonstein and/or LLO.  Defendant DirectTV utilizes the other Defendants to form the "enterprise" acting together in pursuit of the common goal of obtaining hundreds of thousands, if not millions, of dollars from unsuspecting small business owners under the misrepresentation that they are illegally broadcasting the DirectTV signal in their business when it was DirectTV that solicited and set up the account at the business location, knowing it was a business location and then classifying the account as "residential," a practice that is, at its essence, entrapment.

65.    Other methods and means that Defendant J. Lonstein, W. Lonstein, and LLO used to execute and perpetuate the Scheme include, but are not limited to, utilizing their name and law firm to seek to obtain money from small business owners accusing them of illegally broadcasting the DirectTV signal in their business; sending threatening and misleading  form demand letters through the mail to thousands, if not hundreds of thousands, of DirectTV subscribers; use of Defendant J. Lonstein and W. Lonstein's allegedly patented technology and interest in Defendant Signal Auditing to target small business to accuse of piracy; and receiving funds electronically from DirectTV subscribers' bank accounts to collect Scheme proceeds.  The participation of Defendants LLO, J. Lonstein, and W. Lonstein permit Defendant DirectTV to facilitate the collection of monies by threatening, or in very rare cases, actually initiating legal proceedings against these small business owner consumers.

66.    Other methods and means that Defendants Signal Auditing, J. Lonstein, and W. Lonstein used to execute and perpetuate the Scheme include, but are not limited to, use of Defendant W. Lonstein's allegedly "patented technology" and

interest in Defendant Signal Auditing to target small business to accuse of piracy, and use of Defendant Signal Auditing to obtain monies from Defendant DirectTV in the accusation of subscriber piracy. The participation of Defendants Signal Auditing and W. Lonstein allow the enterprise to function more effectively given that "audits" would typically be performed by an uninterested third party with no financial stake in the discovery of an alleged pirated signal.  Defendant Signal Auditing's process is not a patentable process. Indeed, Signal Auditing advertises to those who use its service, a 4-step process to complete the audit which includes: Identifying the offender, allowing the offender to pay a fee (through LLO and Lonstein), covert the offender to a subscribing "good faith" customer (converting to a DirectTV commercial account), and prosecuting nonpaying "offenders."[4] This outline actually describes the Scheme and shows how all of the Defendants are intertwined and crucial to perpetuating the Scheme.

67.     Defendants used thousands of mail and interstate wire transactions to create and perpetuate the Scheme through virtually identical misrepresentations, concealments and material omissions.

## CLASS ALLEGATIONS

68.     This action is brought and may properly proceed as a class action, pursuant to the provisions of Federal Rules of Civil Procedure, Rule 23.

69.     Plaintiffs seek certification of a Class and Subclasses pursuant to Federal Rules of Civil Procedure 23, which is composed of and defined as follows:

a.     **CLASS:**  All businesses and/or business owners in the United States who contacted or, were solicited by DirecTV or its authorized agents; who subsequently had  residential DirecTV services improperly installed in their commercial establishment; who were subsequently audited by Defendant Signal Auditing, Inc.; and who at any time on or after the day four years prior to the date on which the original Complaint was filed, subsequently received communications from Defendants LLO, W. Lonstein, and/or J. Lonstein (the "Lonstein

---

[4]  http://www.signalauditing.com/piracy-solutions

FOURTH AMENDED CLASS ACTION COMPLAINT

Defendants") on behalf of DirectTV seeking money for allegedly unauthorized use by the business of DirecTV licensed programming, which necessarily includes NFL Sunday Ticket or any other programming for which DirecTV retained the Lonstein Defendants to send communications on its behalf.

70.     The members of the Class for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

71.     There are questions of law and fact common to the members of the Class and Subclasses that predominate over questions affecting only individuals. These common questions include:

>           a.     Whether Defendants were employed by or associated with the enterprise, participated, directly or indirectly, in the operation and/or management of the enterprise's affairs through a pattern of racketeering activity;
>
>           b.     Whether Defendants devised a scheme to defraud, entrap, and/or extort;
>
>           c.     Whether the Defendants' scheme was furthered by the use of mail or wire;
>
>           d.     Whether Plaintiffs and the members of the Class and/or Subclasses suffered damages as a result of Defendants' violation(s) of RICO; and
>
>           e.     What relief Plaintiffs and the members of the Class and/or Subclasses are entitled to under the UCL and RICO.

72.     Plaintiffs' claims are typical of the claims of the members of the Class which she represents because all such claims arise out of the same policies, practices, and conduct, and the same or similar documents used by Defendants in their dealings with Plaintiffs.

73.     Plaintiffs have no interests antagonistic to those of the Class and Subclasses.

FOURTH AMENDED CLASS ACTION COMPLAINT

74.     The Class, of which Plaintiffs are members, are readily identifiable.

75.     Plaintiffs will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class counsel has investigated and identified potential claims in the action. Proposed Class counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of the Class are significant, the amount is modest compared to the expense and burden of individual litigation.

77.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members.

78.     The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action, or the prosecution of separate actions by individual members of the Class and Subclasses would create the risk that adjudications with respect to individual members of the Class and Subclasses would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Prosecution as a class action will eliminate the possibility of repetitious litigation.

79.     Defendants have acted, or refused to act, on grounds generally applicable to Plaintiffs and all class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes a whole.

80.     A class action will cause an orderly and expeditious administration of the claims of the Class and Subclasses, and will foster economies of time, effort and

FOURTH AMENDED CLASS ACTION COMPLAINT

1  expense.

2      81.    Plaintiffs do not anticipate any difficulty in the management of this

3  litigation.

4  **FACTUAL ALLEGATIONS: PLAINTIFF DONEYDA PEREZ**

5      82.    Plaintiff Doneyda Perez ("Ms. Perez"), is the owner of Oneida's Beauty

6  and Barber Salon, a beauty salon located at 12342 Harbor Boulevard, Garden Grove,

7  California 92840 until late 2019.

8      83.    In or around 2013, DirecTV's authorized representative entered the

9  beauty salon and spoke with Ms. Perez. The individual represented that he was

10  acting on behalf of DirecTV and told Ms. Perez that DirecTV was offering a

11  promotional deal which would provide her business with satellite cable television

12  services for approximately twenty-seven dollars and fifty cents ($27.50) a month for

13  two (2) years.

14      84.    All communications with the DirecTV representative were in Spanish.

15      85.    As a result of DirecTV's representation, Ms. Perez was interested in

16  purchasing the DirecTV promotional deal – which included Spanish-language

17  channels – for her business because she wanted something for her customers to

18  watch on television while they were in the beauty salon. Ms. Perez thought that the

19  deal offered by DirecTV was a good one, and therefore agreed to purchase the

20  DirecTV promotional deal to provide her business with satellite cable television

21  services from DirecTV for approximately twenty-seven dollars and fifty cents

22  ($27.50) a month for two (2) years.

23      86.    DirecTV never advised Ms. Perez that the satellite cable television

24  services from DirecTV would be provided to her business under a residential

25  account; nor did Ms. Perez ever ask that the satellite cable television services from

26  DirecTV be provided to her business under a residential account. Instead, based

27  solely upon the representations from Defendants and the fact that those discussions

28  had taken place inside the beauty salon, Ms. Perez relied upon DirecTV to provide

her business with satellite cable television services from DirecTV under the correct type of account. Ms. Perez relied upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account. This reliance is what induced Ms. Perez to provide Defendants with her personal information and bank information.

87.    Ms. Perez was not provided with – nor did she sign – a contract, agreement, notice or any other document related to the DirecTV promotional deal except a one-page Equipment Lease Agreement in English, either at the time of installation or at any time thereafter. Ms. Perez never signed a contract of any kind to provide her business with satellite cable television from DirecTV for approximately twenty-seven dollars and fifty cents ($27.50) a month for two (2) years, at the time she agreed to purchase the DirecTV promotional deal. Ms. Perez was only asked to provide her personal information and her bank account information to Defendants.

88.    Ms. Perez was never advised that the satellite cable television services from DirecTV would be provided to her business under a residential account. Similarly, Ms. Perez never attempted to solicit, request, or direct that the satellite cable television services from DirecTV be provided to her business under a residential account. Based upon the representations of DirecTV and the fact the physical installation was inside the beauty salon, Ms. Perez relied upon DirecTV Defendants to provide her business with satellite cable television services from DirecTV under the correct type of account. Thereafter, the only documents related to the DirecTV promotional deal which Ms. Perez ever received were an Equipment Lease Agreement in English and the monthly invoices from DirecTV, which were sent to "2127 West Dogwood Avenue, Anaheim, California 92801." The monthly invoices did not state whether the account was commercial or residential. (*See, e.g., the copy of the June 6, 2014, invoice from DirecTV attached hereto as* **Exhibit A**.)

89.    DirecTV's authorized representative, with whom Ms. Perez spoke, did

not advise her that the satellite cable television services from DirecTV would be (or had been) provided to her business under a residential account; nor did Ms. Perez ever ask that the satellite cable television services from DirecTV be provided to her business under a residential account. Instead, based upon the fact that DirecTV had provided satellite cable television services to the salon for nearly two years, Ms. Perez continued to rely upon DirecTV to provide her business with satellite cable television services from DirecTV under the correct type of account.

90.     It was, therefore, much to Ms. Perez's surprise that she received a phone call in May 2015 from LLO, advising her they had been retained by DirecTV "regarding the unauthorized reception and commercial display of DIRECTV programming at your establishment in violation of the Federal Communications Act and DIRECTV customer agreements." Defendant LLO accused Ms. Perez of "defrauding" and making "misrepresentations" to DIRECTV. During the May 2015 phone call with Ms. Perez, LLO alleged that on April 8, 2015, an "independent auditor" had "observed and recorded your exhibition of DIRECTV programming" without authorization, and threatened prosecution and/or litigation if Ms. Perez did not contact the Lonstein Defendants within seven (7) days to resolve the matter. Ms. Perez was informed that "they" were going to sue her for $75,000.00 for the unauthorized use of DIRECTV services.

91.     Ms. Perez tried to explain that the DirecTV representative that she was told she sought out from DirecTV services but that their representative came to her business soliciting a new commercial account and installed it the same day. The LLO representative continued to accuse Ms. Perez of misrepresentation.

92.     Over the next month, almost on a daily basis, Ms. Perez received numerous telephone calls from a representative of Defendant LLO. The individual always identified herself as DirecTV's attorney and threatened that if Ms. Perez did not pay $75,000.00, they would report her to collections and ruin her credit. Ms. Perez took this to mean they were claiming she owed a debt to DirecTV. Ms. Perez

continued to protest her innocence and maintain she did not owe them $75,000.00. LLO disregarded Ms. Perez's claims and repeated the accusations over and over.

93.     After several calls, LLO lowered the demand to $50,000.00.  Ms. Perez again refused to pay.  The LLO representative was adamant, growing angrier with each call and becoming increasingly more threatening.  Ms. Perez was sent through the mail, a photograph, which Defendants LLO claim was "proof" Ms. Perez was misappropriating DirecTV programming at her beauty salon.  The photo was a grainy, still photo of a television screen with unrecognizable content.

94.     After over a month of nearly daily phone calls and threats, LLO told Ms. Perez if she paid $5,000.00 in installments, they would not take any further action.  Ms. Perez was told this was the last and final "offer."

95.     Ms. Perez received a letter, dated June 26, 2015, (the "June 26, 2015, letter") on the letterhead of the Lonstein Law Office, P.C., with an attached proposed settlement agreement.  In the proposed settlement agreement, LLO alleged that Ms. Perez's business had used the satellite cable television services of DirecTV without authorization and threatened prosecution and/or litigation if Ms. Perez did not pay $5,000.00.  (*See copy of the June 26, 2015, letter and proposed settlement agreement attached hereto as* **Exhibit B**.)

96.     As a result of being misled and fraudulently induced into agreeing to pay $5,000.00 in order to resolve her alleged outstanding balance with DirecTV, Ms. Perez began making monthly payments of $500.00 to LLO via wire transaction. It is unclear what percentage of this amount was paid to DirecTV. (*See July 2, 2015, credit card receipt; August 7, 2015, letter; August 7, 2015, credit card receipt; American Express Authorization Form; and June 1, 2016, statement attached hereto as* **Exhibit C.**) This agreement and all potential class member agreements are voidable and unenforceable because they were based on fraudulent representations and actions by Defendants.

97.     The above-described conduct by Defendants in their transactions with

Plaintiffs are the same and/or substantially similar to the course of conduct engaged in by Defendants in their transactions with numerous other small business owners in California who are similarly situated to Plaintiffs.

98.    Plaintiffs are informed and believes that other minority and small business owners across the United States have been victims of the Scheme.    In Florida, on or around June 2018, a Signal Auditing auditor/investigator signed a sworn affidavit claiming to have observed the 2018 Stanley Cup Final on the restaurant Novecento's televisions.  This affidavit is a sham and is false because the Stanley Cup Finals were not held on June 5, 2018.

99.    A small bar in Nashville, Tennessee was targeted by Signal Auditing in September 2018 whereby the auditor/investigator admits to changing the channel and viewing a purported DirecTV channel even though DirecTV programming was not being broadcast in the commercial establishment upon arrival.  This form of entrapment is not isolated.

100.    These and other examples demonstrate the Scheme has continued and is remains pervasive and will continue.

## FACTUAL ALLEGATIONS: THE NISSENS

101.    Plaintiffs Danny and Marlys Nissen ("Nissens") are the owners of Mo's One More Lounge located at 4515 E. Washburn Road, Washburn, IA 50706.

102.    In 2006, an authorized DIRECTV representative entered the Nissens' business and offered a DIRECTV package that would include service at their business and their home for one price. The Nissens accepted the offer and a satellite dish was installed on both their home and their business. The monthly invoices were sent to their residence and the Nissens continued to pay the DIRECTV invoices into 2013.

103.    In approximately February or March 2013, someone came into Mo's One More Lounge and began taking pictures of the television screens. In about March 2013, the Nissens began receiving calls from Defendant Lonstein Law Office

accusing them of improperly broadcasting DirecTV services in the business without paying commercial rates. The Nissens explained to the LLO employee that a DirecTV representative solicited and installed the service in 2006 because they were trying to secure the business of local small businesses away from the competitor provider. DirecTV disconnected the service at both the Nissens' business and home.

104. Sometime after the service was disconnected, LLO again contacted Marlys Nissen and told her she was behind on her payments for the commercial rate it still owed to DirecTV "per their agreement".  Plaintiff Marlys Nissen stated there had been no agreement sent to them and reiterated they did nothing wrong because a DirecTV authorized representative offered them this package deal in 2006.

105. The Nissens were not contacted by LLO again until approximately February 2015 when they were served with a federal lawsuit. The Nissens retained counsel to defend them against the lawsuit.

106. The Nissens' attorney was initially in contact with an employee of LLO to discuss the lawsuit. The attorney explained that the Nissens have a very small bar/restaurant and simply cannot afford to pay thousands of dollars in fines and legal fees. The Nissens attorney further informed the LLO employee that Marlys Nissen was undergoing cancer treatments which meant funds were very tight at this time, and that they maintain their innocence because it was the DirecTV representative that solicited and sold them this package in their business.

107. When the Nissens' attorney finally spoke with Defendant Julie Lonstein, she argued to the attorney the that statute alleged is a "strict liability" statute and that the Nissens knew they were not authorized to show DirecTV programming in the business. Despite the attorney's protests and reminders that it was a DirecTV representative that installed the services at the business, Defendant Julie Lonstein refused to consider their position and DirecTV refused to accept any amount less than $7,500.00 to settle the matter on the further condition the Nissens agree to a $15,000.00 Consent Decree in the event of a default in payments. On or

FOURTH AMENDED CLASS ACTION COMPLAINT

about March 20, 2015, LLO gave the Nissens an ultimatum to accept the settlement within 3 hours or the "offer" would be withdrawn and DirecTV/LLO would proceed with the lawsuit. Seeing no alternative, the Nissens reluctantly settled with LLO and DirecTV despite their continued contention they did nothing wrong. The Nissans made an initial payment of $2,000.00 and then monthly payments from April 1, 2015 through March 1, 2016 of $500.00 via bank wire, ACH debit, credit card over the phone, Pay Pal or certified check.

## FACTUAL ALLEGATIONS REGARDING JOSEPH ANGELO

108.   Joseph Angelo is the owner of the Stuft Surfer Café, a small "snack shack" located at 101 15th Street, Newport Beach, CA 92663.

109.   In or about 2007 or 2008 Plaintiff Angelo responded to a solicitation from DirecTV and/or a DirecTV authorized representative. A DirecTV authorized representative, wearing DirecTV logo clothing and driving a van with DirecTV signage, met with Mr. Angelo inside the Stuft Surfer Café. The representative informed Mr. Angelo he could set up the service in both the café and at his residence. The DirecTV representative never said anything about having separate accounts for the residence and the business. The DirecTV representative installed a satellite dish on the roof of the business and receivers in both the business and the residence.

110.   In March 2015 Mr. Angelo began receiving letters and calls from Defendant LLO. Mr. Angelo spoke to an employee of Defendant LLO who would not listen to his explanation of how the account was established and instead threatened him and told him it was going to cost him hundreds of thousands of dollars. Mr. Angelo then sought legal representation. At some time after March 2015 Mr. Angelo's DirecTV service at his business and his residence was disconnected by DirecTV.

111.   In a letter, Mr. Angelo's attorney informed LLO the details of how the account was set up and that Mr. Angelo had a good faith belief he was authorized

to broadcast DirecTV programming in his business. Mr. Angelo's attorney opined that the account was mistakenly set up as a residential account. In response to Mr. Angelo's attorney, Defendant Julie Lonstein on April 13, 2015 provided a Site Inspection Report alleging an "audit" was done on February 19, 2015. Defendant Julie Lonstein completely disregarded the fact an authorized DirecTV representative installed the service in the business and instead stated as if fact: "In order for your client to have received the programming on their television, it had to have been by affirmative actions intended to purposely defraud DIRECTV, LLC. Said actions could only have been accomplished by overt acts done to avoid paying the legal subscription rate for a business viewing account within a commercial establishment." The correspondence further directed Mr. Angelo's counsel to a website touting the many "claims, suits and judgments."  The letter went on to state that Mr. Angelo is liable under a strict liability statute and will be liable for DirecTV's attorney's fees and costs.  The letter went on to offer $10,000 to settle the matter, or in the alternative, $7,500 with the establishment of a commercial account with DirecTV.

112.   When Mr. Angelo declined LLO's settlement demand, Defendant Julie Lonstein sent a letter to Mr. Angelo's attorney with the draft of a Complaint. To Plaintiff Angelo's knowledge, the complaint was never filed.

113.   In June 2015 Mr. Angelo sent a letter to DirecTV directly explaining that it was a DirecTV representative that came to his café to install the service. Mr. Angelo also relayed to DirecTV that while this issue was pending, a representative from DirecTV contacted him and when he explained the situation involving Defendants LLO and Julie Lonstein, the representative advised him to open a commercial account and have the equipment installed to resolve the situation. Three days after the service was installed, the DirecTV service was again disconnected and Mr. Angelo learned from his attorney it was because of the pending claim. Mr. Angelo implored DirecTV to permit him to establish a

FOURTH AMENDED CLASS ACTION COMPLAINT

commercial account to resolve the matter. DirecTV did not respond.

114.   In July, seeing no other option, Mr. Angelo paid to Defendant LLO $2,500.00. Mr. Angelo did not reinstate an account with DirecTV.

**FACTUAL ALLEGATIONS REGARDING GREGORY LAPLANTE**

115.   Gregory Laplante is the owner of G and G Smog Centers, Inc. dba G and G Smog located at 460 Tennessee Street, Redlands, CA 92373. Mr. Laplante's business performs state smog inspections of vehicles.

116.   In or around December 2014 one of Mr. Laplante's customers solicited the sale and installation of DirecTV services in his business. Mr. Laplante is informed and believed the customer worked for DirecTV or an authorized dealer. Mr. Laplante was told by the authorized DirecTV representative that he could "link" the business and residential account so Mr. Laplante would receive only one invoice. The DirecTV representative came to Mr. Laplante's business and installed the satellite dish and receiver in the waiting room of Mr. Laplante's business. The DirecTV representative also installed a dish and receiver at Mr. Laplante's home approximately 12 miles away from the business.

117.   In or around May 2015, Mr. Laplante received the standard form letter from LLO accusing him of engaging in commercial misuse of DirecTV services. The letter included a Site Inspection Report and photographs of the television in Mr. Laplante's waiting area.  Mr. Laplante contacted an attorney in Chicago, Illinois to assist him.

118.   In or around May 2015 LLO initially demanded $10,000.00 if Mr. Laplante would accept a business subscription or $7,500.00 without a business subscription. Ultimately, Mr. Laplante felt he had no choice but to pay the claim. He paid to Defendants LLO and DirecTV $7,500.00 without a business subscription and his attorney $750.00. Soon after Mr. Laplante agreed to the settlement, Mr. Laplante's DirecTV services at his home and business were "frozen" by DirecTV, but he received additional monthly invoices. After he

finished paying the settlement, DirecTV also sent Mr. Laplante an invoice for $199 identified as an "early termination fee".

## FACTUAL ALLEGATIONS REGARDING PAUL HOLT

119.   Paul Holt is the owner of 4 Dice Restaurant located at 1990 N. Highway 79, #167, Fordyce, Arkansas 71742.

120.   In or around 2015 or 2016 Plaintiff Paul Holt contacted DirecTV to have services installed at his residence. While the DirecTV representative was installing the service in his residence, he inquired about Mr. Holt's profession/business. When the DirecTV representative learned he owned a restaurant, he solicited Mr. Holt to install services in the restaurant claiming he could put the residence and business on the same account. Plaintiff Holt inquired whether that was permitted, and the DirecTV representative affirmatively stated several times that it was. The DirecTV representative installed a satellite dish and receiver at Mr. Holt's residence and at the 4 Dice Restaurant.

121.   Approximately a year and a half later, in early 2017, Plaintiff Holt received a call that identified the caller as "Lonstein Law". Plaintiff Holt did not recognize the business and did not take the call. However, Mr. Holt looked up Lonstein Law and discovered they go after DirecTV subscribers for alleged unlawful broadcast of DirecTV services in a business with a residential account. Although Plaintiff Holt did not believe he did anything wrong based on the representations of the DirecTV installer, Mr. Holt promptly contacted DirecTV and secured a commercial account for the restaurant.

122.   When Lonstein Law next called, Mr. Holt was asked to provide his DirecTV account number. The LLO employee seemed surprised.  The LLO employee disregarded the fact Mr. Holt now had a valid commercial account and demanded $10,000.00 to stop pursuing Mr. Holt. Mr. Holt refused. Subsequently, Mr. Holt's DirecTV service at both his residence and business were disconnected.

123.   Mr. Holt retained an attorney to try to reason with LLO. He was

FOURTH AMENDED CLASS ACTION COMPLAINT

required to pay the attorney $2,000.00. Ultimately, Mr. Holt paid to LLO and DirecTV $3,000,00.

## <u>COUNT I</u>

### (Racketeer Influenced and Corrupt Organizations Act)

124.   Plaintiffs re-assert and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth at length herein.

125.   RICO further provides that, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt." (18 U.S.C. § 1962(c).)

126.   RICO also provides that "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." (18 U.S.C. § 1962(d).)

127.   At all relevant times, Defendants were natural persons and corporate entities, and are therefore "persons" within the meaning of 18 U.S.C. § 1961(3).

128.   Upon information and belief, Lonstein Law Office and the natural persons employed thereby (Julie Lonstein and Wayne Lonstein); Signal Auditing and DirecTV comprise of three distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4). Each and every natural person and/or corporate entity is associated with the enterprise.

129.   Upon information and belief, each group of defendants, the Lonstein Law Office and the nature persons employed thereby (Julie Lonstein and Wayne Lonstein); Signal Auditing and DirecTV also qualify as separate and distinct enterprises within the meaning of 18 U.S.C. § 1961(4). Each and every Lonstein defendant is employed by or associated with the Lonstein Law Office enterprise; each Signal Auditing defendant is employed by or associated with the Signal Auditing enterprise; and each DirecTV defendant is employed by or associate with

the DirecTV enterprise.

130. Collectively, upon information and belief, the individuals and entities that constitute the Lonstein Defendants, the Signal Auditing Defendants and the DirecTV Defendants constitute an association-in-fact within the meaning of 18 U.S.C. ¶ 1961(4).

131. As set forth herein above the purpose of the enterprise/enterprises (the "Enterprise") is to defraud and extort purported "settlements" and increase DirecTV's commercial accounts from innocent consumers threatened with sham litigation resulting from entrapment and/or false claims of a debt owed. This is accomplished by the Defendants by targeting small businesses for unsolicited sales campaigns and wrongfully providing them residential service in commercial establishments known to be commercial establishments at the time of the sale; the Signal Auditing Defendants engaging in surreptitious "investigation" of these businesses at the direction of the Lonstein and DirecTV Defendants; and the Lonstein Defendants engage in threatening communications intended to scare these small business consumer victims into paying "settlements" and agreeing to lengthy commercial contracts with the threat of sham litigation involving allegations of violations of the Communications Act of 1934 claiming Plaintiffs and Plaintiff Class engaged in the theft of DirecTV programming. The enterprise was formed for the purpose of extorting settlement money from unsuspecting business owners/consumers, increasing through fraud DirecTV's business accounts for which it charges higher rates and enriching all Defendants. The Scheme sets up business owners/consumers to be later accused and threatened with prosecution for violations of the Communications Act, 29 U.S.C. § 605 based on Defendants' false accusations of theft of DirecTV services levied against the small business owners accusing them of broadcasting residential DirecTV programming in a commercial establishment.

132. The Enterprise has been in engaged in, and continues to be in engaged in, activities that affect interstate commerce. Defendants' unlawful Enterprise in

- 32 -

violation of RICO has been and remains longstanding, continuous, and open-ended.

133. Defendants, individually and collectively, as an Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity and have, therefore, violated 18 U.S.C. § 1962(c).

134. Defendants' Extortion Scheme includes, but is not limited to:

a. **Mail Fraud:** Defendants violated 18 U.S.C. § 1341, by sending or receiving or causing to be sent or received, materials via email, U.S. mail or commercial interstate carriers for the purpose of executing the Scheme, which amounts to a material scheme to defraud and obtain money on false pretenses, misrepresentations, and/or omissions.  Defendants' use of mail formed a central feature of the scheme and included communications by form letters from LLO on LLO letterhead listing the Lonstein Defendants as attorneys, and includes the alleged "evidence" provided by Defendants Signal Auditing in the form of a "Site Inspection," created by the Signal Auditing auditor at the direction of LLO, mailed to class member targets of the Scheme, and the series of follow up notices mailed to class members who did not fully pay the demanded amounts in response to the initial letter as described herein.  In addition, class member victims were instructed by Defendants to send payments demanded either by wire as discussed below or by certified check through the U.S. Mail.

b. **Wire Fraud**: Defendants violated 18 U.S.C. § 1343, by transmitting, receiving or causing to be transmitted or received materials and monies by wire for the purpose of executing the Scheme to defraud and obtain money on false pretenses, misrepresentations and/or omissions.  Defendants instructed

- 33 -

FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs and class members to make payments through the use of interstate wire communications in violation of 18 U.S.C. § 1343. The materials transmitted and/or received, include, but are not limited to, interstate credit card or bank transactions, emails to the target business owners, ACH debit transactions, and/or PayPal wire transmission to Defendants LLO which then such proceed split is then transmitted via wire and/or check to the other Defendants. On information and belief, Plaintiffs allege, all participants in the Scheme transmit and share information through an online web-based portal that can be accessed by all Scheme participants. Defendant Signal Auditing uses the portal to obtain the DirecTV "Legal Lists" and where the auditors/investigators transmit or upload site inspections showing "hits". LLO accesses the portal to determine which small business owners to target with emails, letters and calls to obtain the Scheme proceeds. Upon information and belief, Plaintiffs further allege Scheme proceeds are distributed to Scheme participants through wire transfers and/or U.S. Mail.

135. Defendants have used email, U.S. mail and wires in connection with every small business target and subsequently "audited," and each use of the mails and wires has furthered the fraudulent Scheme and enables Defendants to take money and property from Plaintiffs and putative class members by means of false pretenses and representations

136. Defendants violated 18 U.S.C. § 1962(d) by conspiring to engage in racketeering activity.

137. Defendants, individually and jointly, as part of an enterprise, agreed to commit more than two racketeering acts, with knowledge that the objective was unlawful and intended to further that unlawful objective. The multiple acts of

racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

138.   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1), include wire fraud and mail fraud as described herein to perpetuate the Scheme described herein: (a) targeting and soliciting small business owners to purchase satellite cable television services from DirecTV at a "special" price or rate; (b) establishing a residential satellite cable television service account for the small businesses although Defendants knew or should have known that the small business owners intended to use those services in their businesses; (c) providing satellite cable television to small businesses under residential accounts although the small business owners relied upon Defendants to provide commercial services; (d) deliberately and specifically targeting small business owners for a "signal audit" based on a pre-determined finding that the small business owners had "pirated" or "stolen" satellite cable television services from DirecTV; and (e) threatening the small business owners with repeatedly factual and legal misrepresentations in the form of claims of amounts actually "owed", threats of damage to credit profile, threats of sham prosecution and/or costly legal action, threatening prosecution in an action involving violations of the Communications Act of 1934, all undertaken in order to extort an unreasonable and unconscionable "settlement" from them and increase DirecTV's lucrative commercial accounts.  The predicate acts by the Enterprise have continued from at least 4 years prior to the filing of this action, during the pendency of this action and based on information and belief, will continue.  Small business owners from various cities and states throughout the United States continue to be victimized by Defendants through this Scheme.

139.   Defendants' predicate acts of racketeering amount to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions.

FOURTH AMENDED CLASS ACTION COMPLAINT

140.    Defendants    knowingly    and    intentionally    made    these misrepresentations, acts of concealment and failures to disclose. Defendants either knew or recklessly disregarded that these were material representations and omissions. Defendants, and all of them, participate in the Scheme designed to collect from unsuspecting small business owners/consumers an unlawful debt.

141.    Plaintiffs and those similarly situated to her have suffered harm and have been injured from Defendants' violations of RICO in the amount of the unexpected    increased    monthly    fees,    forced    continued    subscriber    status, indebtedness, settlement payments, either paid or to be paid, constituting overpayment for services and an injury to property. In the absence of Defendants' violations of 18 U.S.C. § 1962, Plaintiffs and the Class would not have incurred these concrete financial losses.

142.    Plaintiffs' and the Classes' injuries were directly and proximately caused by Defendants' racketeering activity.

143.    Defendants knew and intended that Plaintiffs and the Class would rely on the Scheme's fraudulent representations and omissions. Defendants knew and intended Plaintiffs and the Class would pay monies to Defendants as a result of threat of sham litigation and misrepresentations of the ramifications if Plaintiffs and the Class did not pay.

144.    Plaintiffs' and the Classes' injuries were directly and proximately caused by Defendants' racketeering activity.

145.    Defendants knew and intended that Plaintiffs and the Class would rely on the Scheme's fraudulent representations and omissions. Defendants knew and intended Plaintiffs and the Class would pay monies to Defendants as a result of same.

146.    Plaintiffs and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to 18 U.S.C. § 1964(c).

/ / /

FOURTH AMENDED CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs on behalf of themselves and all others similarly situated, demands judgment against Defendants as follows:

1.      An order certifying the Class for money damages under Federal Rules of Civil Procedure Rule 23, and appointing Plaintiff as Class Representative and appointing her attorneys as Class Counsel;

2.      Order Defendants to engage in a corrective notice campaign, and requiring Defendants to refund to Plaintiff and all Class Members the funds paid;

3.      An accounting of all amounts that Defendants collected from Plaintiff and Class Members as a result of the Scheme;

4.      A judgment for actual damages;

5.      A judgment for compensatory damages;

6.      A judgment for treble damages under RICO;

7.      A judgment for reasonable attorney fees and costs of suit in connection with this action, pursuant to the RICO [18 U.S.C. §1964(c)], California Civil Code 1021.5 and any other applicable statute;

8.      A judgment for pre-judgment and post-judgment interest; and/or

9.      A judgment for all such other and further relief as the Court deems equitable and just.


Dated: December 17, 2020          **MAHONEY LAW GROUP, APC**

                                **LISA L. CLAY, ATTORNEY AT LAW**


                                _/s/Katherine J. Odenbreit_
                                Katherine J. Odenbreit
                                Lisa L. Clay
                                Attorneys for Plaintiff, DONEYDA PEREZ, DANNY NISSEN, MARLYS NISSEN, JOSEPH ANGELO, GREGORY LAPLANTE and PAUL HOLT, individually and on behalf of their respective businesses and on behalf of all others similarly situated

- 37 -

FOURTH AMENDED CLASS ACTION COMPLAINT

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues subject to trial.

Dated: December 17, 2020

**MAHONEY LAW GROUP, APC**

**LISA L. CLAY, ATTORNEY AT LAW**

_/s/Katherine J. Odenbreit_
Katherine J. Odenbreit
Lisa L. Clay
Attorneys for Plaintiff, DONEYDA PEREZ, DANNY NISSEN, MARLYS NISSEN, JOSEPH ANGELO, GREGORY LAPLANTE and PAUL HOLT, individually and on behalf of their respective businesses and on behalf of all others similarly situated

FOURTH AMENDED CLASS ACTION COMPLAINT