Kevin Mahoney (SBN: 235367)
kmahoney@mahoney-law.net
Katherine J. Odenbreit (SBN: 184619)
kodenbreit@mahoney-law.net
Kate Nicole G. Blanco (SBC: 31344)
Kblanco@mahoney-law.net
**MAHONEY LAW GROUP, APC**
249 East Ocean Blvd., Suite 814
Long Beach, CA  90802
Telephone: (562) 590-5550
Facsimile: (562) 590-8400

Lisa L. Clay (*Pro Hac Vice*)
lisa@clayatlaw.com
**LISA L. CLAY, ATTORNEY AT LAW**
2100 Manchester Road, Suite 1612
Wheaton, IL 60187
Telephone: (630) 456-4818

Attorneys for Plaintiffs DONEYDA PEREZ, DANNY NISSEN, MARLYS NISSEN, JOSEPH ANGELO, GREGOGRY LAPLANTE and PAUL HOLT, individually and on behalf of their respective businesses, and on behalf of all others similarly situated.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| DONEYDA PEREZ as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTV GROUP HOLDINGS, LLC, a Delaware Corporation, LONSTEIN LAW OFFICES, P.C., a New York Professional Corporation; SIGNAL AUDITING, INC., a New York Corporation, JULIE COHEN LONSTEIN and WAYNE M. LONSTEIN,<br><br>Defendants. | Case No. 8:16-CV-01440-JLS-DFM<br><br>**DECLARATION OF DONEYDA PEREZ IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Date:   August 19, 2022<br>Time:  10:30 a.m.<br>Dept.:  8A<br><br>Fourth Amended Complaint Filed: December 17, 2020 |

# DECLARATION OF DONEYDA PEREZ

I, Doneyda Perez hereby declare as follows:

1. This Declaration is based on my personal knowledge. I am over the age of 18 years old, and if called as a witness, I would and could completely testify to these facts.

2. I was the owner and operator of Oneida's Beauty and Barber Salon in Garden Grove, California for over 10 years until late 2019.

3. In or around 2013, a DIRECTV representative came to my shop and spoke to me about installing DIRECTV services in my business. The representative spoke to me in Spanish. The individual told me he was there on behalf of DIRECTV and was offering a promotional deal to provide my business with satellite television services including Spanish-language programming. I was interested because I wanted something for my clients to watch on television while in the salon and the price seemed reasonable. I agreed to purchase the DIRECTV promotional deal for my business.

4. The DIRECTV representative never told me that the services provided to my business was under a residential account. The single document presented to me by the representative was in English. My understanding was the services were being purchased and installed for my business, especially because the representative walked into my business and sold me the services. The services were also installed in my business by a DIRECTV representative which included installing a satellite dish on the roof of the building. I never asked the DIRECTV representative and we did not discuss DIRECTV services for my home which was located several miles away from my salon. The representative did ask for my home address and my understanding was that is where the bill would be sent.

5. Sometime around May 2015 I received a phone call on my cell phone from a law firm in New York. The representative did not speak Spanish so a customer in my shop at the time interpreted for me. I later learned it was the

- 1 -
DECLARATION OF DONEYDA PEREZ

1  Lonstein Law Office. I was told that they had been retained by DIRECTV and were
2  calling regarding the unauthorized reception and commercial display of DIRECTV
3  programming in my business in violation of the Federal Communications Act and
4  DIRECTV customer agreement. The law firm accused me of "defrauding" and
5  making "misrepresentations" to DIRECTV. The law firm also said an independent
6  auditor came to my salon and observed me showing DIRECTV programming
7  without authorization and threatened to sue me for over $75,000 if I did not contact
8  them within a week to resolve the matter.

      6.     I tried to explain to the law firm that a DIRECTV representative came to my business selling DIRECTV services for my business and installed it in the business the same day. The law firm representative continued to accuse me of misrepresentation and lying.

      7.     Over the next month, on almost a daily basis, I received calls from the Lonstein Law Office. The individual always identified herself as DIRECTV's attorney and threatened if I did not pay the $75,000, they would report me to collections and ruin my credit. I tried several times again to explain it was DIRECTV who came to me and offered the services to be installed in my business. Each call, the law firm representative was more angry and more threatening. After several calls, the law firm lowered their demand to $50,000. I told them I could not pay and I did not think I did anything wrong. The law firm sent me a photograph the representative said was "proof" I was stealing DIRECTV services. The photograph was a picture of the television screen in my salon with unrecognizable content.

      8.     After several more phone calls from the law firm accusing me of stealing DIRECTV services, they offered to resolve the matter for $5,000. I refused saying I did nothing wrong. The lawyer told me if I did not agree they would put a lien on my home and ruin my credit. Even though I did nothing wrong, I was scared and did not know what they could do to me or my business if I did not pay. The law

firm sent me a letter saying I would pay $500.00 each month from my bank account for 9 months. I did not sign the agreement because it was in English but the Lonstein Law Office charged my bank account each month for 9 months.

9. I know that I did not do anything wrong. I feel like I was tricked and lied to by the DIRECTV representative and then forced to pay DIRECTV and its attorneys' money.

10. I believe DIRECTV has utilized this scheme of soliciting services and later claiming the services to be used illegally for the purpose of extorting money from small businesses like mine who lack the means to defend themselves and are scared to risk an unfavorable judgment. I knew that I could not be the only one this happened to so I started to search for a lawyer. After looking into several attorneys, I found the Mahoney Law Group. After a few meetings with Mahoney Law Group, they agreed to take the case and file a class action. I wanted to file a class action because I knew there had to be a lot of small business owners, like me, who were forced to pay money to DIRECTV and the Lonstein Law Office even though they did not do anything wrong.

11. Even before I filed this case and was named as a Class Representative, I made myself available to class counsel at their request. I met with attorney Katherine Odenbreit in person. After the case was filed, I spent a significant number of hours searching for and reviewing documents in my possession and reviewing them with my attorneys. I had to look through bank records, social media posts and boxes of documents in my home to find anything having to do with DIRECTV. I also spent time reviewing documents produced by Defendants and discussing them with my attorneys. I participated in many telephone calls with my attorneys, reviewed discovery related to documents in my possession and many calls discussing the mediation and settlement in this matter.  In 2019 I sold my business and moved to Texas. I flew back to California at least 3 times to meet with my attorneys and to attend my deposition.

DECLARATION OF DONEYDA PEREZ

12. My deposition took place in March 2020. There were two days scheduled for my deposition and I was told that there would be a third day scheduled.

13. During the deposition, the attorney for DIRECTV showed me a photo he was using as an exhibit. It was a photo with a satellite dish on the roof behind me. Many years before that photo was taken, a roommate of mine had it installed. I do not know if it was a DIRECTV satellite. I have never requested DIRECTV services be installed at my residence.

14. During the deposition I was asked for the name and contact information for anyone who ever lived with me at my home in California. I was also asked for names and contact information for family who stayed with me at my home in California. This caused me great fear because in the country where I am from, family members can be kidnapped and held for ransom if kidnappers believe their family in the United States has money. My understanding is my lawyers gave the contact information to DIRECTV lawyers and later I learned that DIRECTV lawyers contacted former roommates and the new owners of my home. Some of these people called me and were mad they were being brought into this case. Others were scared because they did not know why people were trying to contact them about this case.

15. After the first day of deposition, my cell phone was running slow. I knew from previous experience that if I deleted some pictures, the cell phone would work better. I did not think this would be a problem because I did not delete anything that had to do with DIRECTV. I do not remember the type of pictures I deleted specifically, but I do not believe I deleted anything that could be relevant to this case. At the end of the deposition my lawyers took my cell phone. I was told that the phone was given to the court and then would be examined by an expert. I was without my phone for more than 5 months, and did not have the contact information for my family. My friends and family members also were not able to contact me for an extended period of time, especially my family members who lived outside of the United States. I had to purchase a new phone and tried to find the phone numbers

1  and contact information for my friends and family.

2  16. I understand that experts went through my phone to get the deleted photos, texts, emails and other information. I am informed that there were over 94,000 images that had to be reviewed by my attorneys. I was also informed that there were some very private photographs that my attorneys told me would not be produced, but I am embarrassed because they had to look at them. This was very upsetting to me being required to let people dig through my personal life and personal information to try to find pictures of a satellite dish.

17. During my deposition I also learned that DIRECTV sent people to my former home in Garden Grove, California to take pictures of my home and the satellite dish on the roof when I lived there. I was not aware someone was there taking pictures of my previous home.

18. DIRECTV wanted to inspect the satellite dish that was on the roof of my former home in Garden Grove, California. I sold the home in 2019. I was required to put the new owners in contact with my attorneys to discuss this issue with the new owners.

19. I was also informed that there was a personal inspection of my former business. From what I understand, the attorneys and others went to my former business to inspect the satellite dish on the roof of the building.

20. I was also informed by family members and my former roommates, some of whom still lived in my former residence in Garden Grove, California, that they were contacted by DIRECTV investigators without any warning who asked them questions about me and asked them to testify against me. First, they called and then they went to the house. One of my past roommates told me that DIRECTV offered her money to testify against me in this case. My lawyers told me that DIRECTV denies this but that is what she told me.

21. I estimate I have spent nearly 200 hours of my time on this case.

22. I also am aware that DIRECTV was going to argue I am not an adequate

- 5 -

DECLARATION OF DONEYDA PEREZ

Class Representative. I believe I am an adequate Class Representative. Throughout this case I have had to defend my actions even though I do not believe I did anything wrong because it was DIRECTV that came to my business and sold me their services. I have always put the interests of the class first and have not pursued a settlement of only my claims. I have continued to pursue this case even though it has taken far more of my time and effort to do so. I was willing to keep fighting because I believed other businesses experienced the same situation that I did. As a small business owner, I understand how scary and devastating it can be to believe you would be sued for tens of thousands of dollars.

23. When I agreed to become a Class Representative, I understood that I have a fiduciary duty to the class which I understand to mean that I must act on their behalf and not in my own interests. I further understood that I would be required to actively participate in the litigation, so I have maintained regular communication with my attorneys and have assisted when asked. I travelled back to California when necessary and at the request of my attorneys. I knew and appreciated the risk I was taking in agreeing to become a Class Representative in this case. I appreciated that Defendants were vigorously defending the action and knew my business may be subject to investigation and scrutiny, I would be required to sit through days of deposition and would be required to devote a significant amount of time to the litigation. I further knew the risk of potentially being liable for litigation costs associated with defending the case in the event a judgment was awarded to Defendants. I took those risks willingly to secure recovery for the class.

24. During settlement negotiations I understood the risks of moving forward with further class certification efforts and potential trial. Since the settlement negotiations lasted over a year, I maintained in regular contact with my attorneys during this time to receive updates on the negotiations and status of the case. Based on the substantial information provided and conversations with my attorneys, I believe the pending settlement terms are fair, reasonable, adequate and

in the best interests of the class.

25. I understand that this declaration is submitted in support of this Court's consideration of Plaintiffs' Motion for Approval of the Settlement. I have reviewed the terms of the Settlement and discussed them with Ms. Odenbreit. I support this Settlement and believe it provides a reasonable recovery for the class members.

26. I understand that as part of the Settlement, a request will be made on my behalf for a service/incentive award in the amount of $30,000.00. I understand that I am not guaranteed this payment and that it must be approved by the Court. When I agreed to become a Class Representative, no one promised me any additional payment or discussed with me any certain amount to be requested and it has been made clear to me such request must be approved by the Court. I believe in light of the foregoing that this request is reasonable.

27. While I did not type this declaration, a copy was provided to me before I signed and I was given the opportunity to make changes. The language of the declaration has been drafted by my attorney Ms. Odenbreit based on my verbal statements. I adopt this declaration as my own statement. I was also provided a copy of this Declaration translated into Spanish and was able to read and understand the Declaration.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated this day _____2022 at Katy, Texas.

_____
Doneyda Perez

# DECLARACIÓN DE DONEYDA PÉREZ

Yo, Doneyda Pérez declaro como sigue:

1. Esta Declaración se basa en mi conocimiento personal. Soy mayor de 18 años, y si me llamara como testigo, testificaría y podría testificar completamente de estos hechos.

2. Fui propietaria y operadora de Oneida's Beauty and Barber Salon en Garden Grove, California, durante más de 10 años hasta finales de 2019.

3. El o alrededor de 2013, un representante de DIRECTV vino a mi tienda y me habló sobre la instalación de servicios de DIRECTV en mi negocio. El representante me habló en español. El individuo me dijo que estaba allí en nombre de DIRECTV y que estaba ofreciendo un trato promocional para proporcionar a mi negocio servicios de televisión por satélite, incluida la programación en español. Estaba interesada porque quería algo para que mis clientes vieran en la televisión mientras estaban en el salón y el precio parecía razonable. Acordé comprar el acuerdo promocional de DIRECTV para mi negocio.

4. El representante de DIRECTV nunca me dijo que los servicios prestados a mi negocio estaban bajo una cuenta residencial. El documento único que me presentó el representante estaba en inglés. Mi entendimiento era que los servicios estaban siendo comprados e instalados para mi negocio, especialmente porque el representante entró en mi negocio y me vendió los servicios. Los servicios también fueron instalados en mi negocio por un representante de DIRECTV, lo que incluyó la instalación de una antena parabólica en el techo del edificio. Nunca le pregunté al representante de DIRECTV y no discutimos los servicios de DIRECTV para mi casa, que estaba ubicada a varias millas de mi salón. El representante pidió mi domicilio y mi entendimiento era que es ahí donde se enviaría la factura.

5. En algún momento alrededor de mayo de 2015 recibí una llamada

- 1 -
DECLARACIÓN DE DONEYDA PÉREZ

telefónica en mi teléfono celular de un bufete de abogados en Nueva York. El representante no hablaba español, así que un cliente en mi tienda en ese momento interpretó para mí. Más tarde supe que era Lonstein Law Office. Me dijeron que habían sido contratados por DIRECTV y que estaban llamando con respecto a la recepción y la exhibición comercial no autorizadas de la programación de DIRECTV en mi negocio en violación de la Ley Federal de Comunicaciones y el acuerdo del cliente de DIRECTV. El bufete de abogados me acusó de "defraudar" y hacer "tergiversaciones" a DIRECTV. El bufete de abogados también dijo que un auditor independiente vino a mi salón y me observó mostrando la programación de DIRECTV sin autorización y amenazó con demandarme por más de $75,000 si no me comunicaba con ellos dentro de una semana para resolver el asunto.

6. Traté de explicarle al bufete de abogados que un representante de DIRECTV vino a mi negocio vendiendo servicios de DIRECTV para mi negocio y lo instaló en el negocio el mismo día. El representante del bufete de abogados continuó acusándome de tergiversación y mentira.

7. Durante el mes siguiente, casi a diario, recibí llamadas de la Lonstein Legal Office. La persona siempre se identificó como la abogada de DIRECTV y amenazó con que si no pagaba los $75,000, me reportarían a cobranzas y arruinarían mi crédito. Intenté varias veces de nuevo explicar que fue DIRECTV quien vino a mí y me ofreció los servicios para instalarlos en mi negocio. En cada llamada, la representante del bufete de abogados estaba más enojada y más amenazante. Después de varias llamadas, el bufete de abogados redujo su demanda a $50,000. Les dije que no podía pagar y que no creía haber hecho nada malo. El bufete de abogados me envió una fotografía que el representante dijo que era una "prueba" de que estaba robando los servicios de DIRECTV. La fotografía era una imagen de la pantalla de televisión en mi salón con contenido irreconocible.

8. Después de varias llamadas telefónicas más del bufete de abogados acusándome de robar servicios de DIRECTV, ofrecieron resolver el asunto por

1  $5,000. Me negué diciendo que no hice nada malo. El abogado me dijo que si no
2  estaba de acuerdo, pondrían un gravamen sobre mi casa y arruinarían mi crédito. A
3  pesar de que no hice nada malo, estaba asustada y no sabía lo que podrían hacerme
4  a mí o a mi negocio si no pagaba. El bufete de abogados me envió una carta diciendo
5  que yo pagaría $500.00 cada mes de mi cuenta bancaria durante 9 meses. No firmé
6  el acuerdo porque estaba en inglés, pero Lonstein Legal Office cobró mi cuenta
7  bancaria cada mes durante 9 meses.

8  9. Sé que no hice nada malo. Siento que el representante de DIRECTV
9  me engañó y mintió y luego me obligó a pagar el dinero a DIRECTV y sus
10 abogados.

11 10. Creo que DIRECTV ha utilizado este esquema de solicitar servicios y
12 luego reclamar que los servicios se usen ilegalmente con el propósito de extorsionar
13 a pequeñas empresas como la mía que carecen de los medios para defenderse y
14 tienen miedo de arriesgarse a un fallo desfavorable. Sabía que no podía ser la única
15 al que le pasaba esto, así que comencé a buscar un abogado. Después de buscar
16 varios abogados, encontré Mahoney Law Group. Después de algunas reuniones con
17 Mahoney Law Group, acordaron tomar el caso y presentar una demanda colectiva.
18 Quería presentar una demanda colectiva porque sabía que tenía que haber muchos
19 propietarios de pequeñas empresas, como yo, que se vieron obligados a pagar dinero
20 a DIRECTV y Lonstein Legal Office a pesar de que no hicieron nada malo.

21 11. Incluso antes de presentar este caso y ser nombrada representante de
22 la clase, me puse a disposición de los abogados de la clase a petición de ellos. Me
23 reuní con la abogada Katherine Odenbreit en persona. Después de que se presentó
24 el caso, pasé un número significativo de horas buscando y revisando documentos
25 en mi poder y revisándolos con mis abogados. Tuve que revisar los registros
26 bancarios, las publicaciones en las redes sociales y las cajas de documentos en mi
27 casa para encontrar algo que tuviera que ver con DIRECTV. También pasé tiempo
28 revisando documentos producidos por los demandados y discutiéndolos con mis

abogados. Participé en muchas llamadas telefónicas con mis abogados, revisé el descubrimiento relacionado con los documentos en mi poder y muchas llamadas discutiendo la mediación y la conciliación en este asunto. En 2019 vendí mi negocio y me mudé a Texas. Volé de regreso a California al menos 3 veces para reunirme con mis abogados y asistir a mi declaración jurada.

12. Mi declaración jurada tuvo lugar en marzo de 2020. Había dos días programados para mi declaración jurada y me dijeron que habría un tercer día programado.

13. Durante la declaración jurada, el abogado de DIRECTV me mostró una foto que estaba usando como exhibición. Era la foto con una antena parabólica en el techo detrás de mí. Muchos años antes de que se tomara esa foto, un compañero de cuarto mío la instaló. No sé si era un satélite de DIRECTV. Nunca he solicitado que los servicios de DIRECTV se instalen en mi residencia.

14. Durante la declaración jurada me pidieron el nombre y la información de contacto de cualquier persona que haya vivido conmigo en mi casa en California. También me pidieron nombres e información de contacto de la familia que se quedó conmigo en mi casa en California. Esto me causó un gran temor porque en el país de donde soy, los miembros de la familia pueden ser secuestrados y retenidos para pedir rescate si los secuestradores creen que su familia en los Estados Unidos tiene dinero. Tengo entendido que mis abogados dieron la información de contacto a los abogados de DIRECTV y más tarde me enteré de que los abogados de DIRECTV contactaron a ex compañeros de cuarto y a los nuevos propietarios de mi casa. Algunas de estas personas me llamaron y estaban enojadas porque estaban siendo traídas a este caso. Otros estaban asustados porque no sabían por qué la gente estaba tratando de contactarlos sobre este caso.

15. Después del primer día de declaración jurada, mi teléfono celular funcionaba lento. Sabía por experiencia previa que si borraba algunas fotos, el teléfono celular funcionaría mejor. No pensé que esto sería un problema porque no

borré nada que tuviera que ver con DIRECTV. No recuerdo el tipo de imágenes que borré específicamente, pero no creo que haya borrado nada que pueda ser relevante para este caso. Al final de la declaración, mis abogados tomaron mi teléfono celular. Me dijeron que el teléfono fue entregado al tribunal y luego sería examinado por un experto. Estuve sin mi teléfono por más de 5 meses, y no tenía la información de contacto de mi familia. Mis amigos y familiares tampoco pudieron contactarme por un período prolongado de tiempo, especialmente los miembros de mi familia que vivían fuera de los Estados Unidos. Tuve que comprar un teléfono nuevo y busqué los números de teléfono y la información de contacto de mis amigos y familiares.

16. Entiendo que los expertos revisaron mi teléfono para obtener las fotos, textos, correos electrónicos y otra información eliminados. Me informan que había más de 94,000 imágenes que tuvieron que ser revisadas por mis abogados. También me informaron que había algunas fotografías muy privadas que mis abogados me dijeron que no se producirían, pero me da vergüenza porque tuvieron que mirarlas. Esto fue muy molesto para mí que me exigieran que dejara que la gente hurgara en mi vida personal e información personal para tratar de encontrar imágenes de una antena parabólica.

17. Durante mi declaración jurada también me enteré de que DIRECTV envió personas a mi antigua casa en Garden Grove, California, para tomar fotos de mi casa y la antena parabólica en el techo cuando vivía allí. No sabía que alguien estaba allí tomando fotos de mi casa anterior.

18. DIRECTV quería inspeccionar la antena parabólica que estaba en el techo de mi antigua casa en Garden Grove, California. Vendí la casa en 2019. Se me pidió que pusiera a los nuevos propietarios en contacto con mis abogados para discutir este tema con los nuevos propietarios.

19. También me informaron que había una inspección personal de mi antiguo negocio. Por lo que entiendo, los abogados y otros fueron a mi antiguo negocio para inspeccionar la antena parabólica en el techo del edificio.

Case 8:16-cv-01440-JLS-DFM   Document 619-6   Filed 03/22/22   Page 14 of 17   Page ID #:14506

20. También me informaron miembros de la familia y mis ex compañeros de cuarto, algunos de los cuales todavía vivían en mi antigua residencia en Garden Grove, California, que fueron contactados por investigadores de DIRECTV sin previo aviso que les hicieron preguntas sobre mí y les pidieron que testificaran en mi contra. Primero llamaron y luego fueron a la casa. Una de mis compañeras de cuarto anteriores me dijo que DIRECTV le ofreció dinero para testificar en mi contra en este caso. Mis abogados me dijeron que DIRECTV niega esto, pero eso es lo que ella me dijo.

21. Calculo que he pasado casi 200 horas de mi tiempo en este caso.

22. También soy consciente de que DIRECTV iba a argumentar que no soy una Representante de Clase adecuada. Creo que soy una Representante de Clase adecuado. A lo largo de este caso he tenido que defender mis acciones, aunque no creo que haya hecho nada malo porque fue DIRECTV la que llegó a mi negocio y me vendió sus servicios. Siempre he puesto los intereses de la clase en primer lugar y no he buscado un acuerdo de sólo mis reclamaciones. He seguido adelante con este caso a pesar de que me ha llevado mucho más tiempo y esfuerzo hacerlo. Estaba dispuesta a seguir luchando porque creía que otras empresas experimentaron la misma situación que yo. Como propietaria de una pequeña empresa, entiendo lo aterrador y devastador que puede ser creer que sería demandado por decenas de miles de dólares.

23. Cuando acepté convertirme en Representante de Clase, entendí que tengo un deber fiduciario con la clase, lo que entiendo que significa que debo actuar en su nombre y no en mi propio interés. Además, entendí que se me exigiría participar activamente en el litigio, por lo que he mantenido una comunicación regular con mis abogados y he ayudado cuando se me ha pedido. Viajé de regreso a California cuando fue necesario y a petición de mis abogados. Sabía y apreciaba el riesgo que estaba tomando al aceptar convertirme en una Representante de Clase en este caso. Aprecié que los Demandados estuvieran defendiendo vigorosamente la

DECLARACIÓN DE DONEYDA PÉREZ

acción y sabía que mi negocio podría estar sujeto a investigación y escrutinio, se me exigiría que me sentara durante días de declaración jurada y se me exigiría que dedicara una cantidad significativa de tiempo al litigio. Además, conocía el riesgo de ser potencialmente responsable de los costos de litigio asociados con la defensa del caso en caso de que se otorgara un fallo a los Demandados. Tomé esos riesgos voluntariamente para asegurar la recuperación de la clase.

24. Durante las negociaciones del acuerdo, entendí los riesgos de seguir adelante con más esfuerzos de certificación de clase y un posible juicio. Dado que las negociaciones de la conciliación duraron más de un año, me mantuve en contacto regular con mis abogados durante este tiempo para recibir actualizaciones sobre las negociaciones y el estado del caso. Con base en la información sustancial proporcionada y las conversaciones con mis abogados, creo que los términos de la conciliación pendiente son justos, razonables, adecuados y en el mejor interés de la clase.

25. Entiendo que esta declaración se presenta en apoyo de la consideración de este Tribunal de la Moción de los Demandantes para la Aprobación de la Conciliación. He examinado los términos de la Conciliación y los he discutido con la Srta. Odenbreit. Apoyo esta Conciliación y creo que proporciona una recuperación razonable para los miembros de la clase.

26. Entiendo que como parte de la conciliación, se hará una solicitud en mi nombre para un laudo por servicio/incentivo por una cantidad de $30,000.00. Entiendo que no se me garantiza este pago y que debe ser aprobado por el Tribunal. Cuando acepté convertirme en un representante de Clase, nadie me prometió ningún pago adicional ni discutió conmigo ninguna cantidad determinada que se solicitaría y me ha quedado claro que dicha solicitud debe ser aprobada por el Tribunal. Creo, a la luz de lo anterior, esta solicitud es razonable.

27. Si bien no escribí esta declaración, se me proporcionó una copia antes de firmar y se me dio la oportunidad de hacer cambios. El texto de la declaración

1 ha sido redactado por mi abogada, la Srta. Odenbreit, sobre la base de mis
2 declaraciones verbales. Apruebo esta declaración como mi propia declaración.
3 También me proporcionaron una copia de esta Declaración traducida al español y
4 pude leer y entender la Declaración.
5     Declaro bajo pena de perjurio bajo las leyes de los Estados Unidos y el Estado
6 de California que lo anterior es verdadero y correcto.

Fechada este día 03/18/2022 de 2022 en Katy, Texas.

Doneyda A. Perez

Doneyda Pérez

- 8 -
DECLARACIÓN DE DONEYDA PÉREZ

CERTIFICATION OF TRANSLATION

    Manuel Duran, a translator certified by the Judicial Council of California and the Office of Federal Courts, certifies that he translated/transcribed the following document(s) completely and accurately, and to the best of his ability:

**DECLARATION OF DONEYDA PEREZ**

from English to Spanish. I swear under penalty of perjury that the foregoing is true and correct. Signed on March 21, 2022 in Oceanside, California.

CALIFORNIA JUDICIAL COUNCIL CERTIFICATION 300344
March 21, 2022
DATE

Manuel Duran
California Certification No. 300344
Federal Court Certification No. 93-462

Page 1 of 2