Kevin Mahoney (SBN: 235367)
kmahoney@mahoney-law.net
Katherine J. Odenbreit (SBN: 184619)
kodenbreit@mahoney-law.net
Kate Nicole G. Blanco (SBC: 31344)
Kblanco@mahoney-law.net
**MAHONEY LAW GROUP, APC**
249 East Ocean Blvd., Suite 814
Long Beach, CA  90802
Telephone: (562) 590-5550
Facsimile: (562) 590-8400

Lisa L. Clay (*Pro Hac Vice*)
lisa@clayatlaw.com
**LISA L. CLAY, ATTORNEY AT LAW**
2100 Manchester Road, Suite 1612
Wheaton, IL 60187
Telephone: (630) 456-4818

Attorneys for Plaintiffs DONEYDA PEREZ, DANNY NISSEN, MARLYS NISSEN, JOSEPH ANGELO, GREGOGRY LAPLANTE and PAUL HOLT, individually and on behalf of their respective businesses, and on behalf of all others similarly situated.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| DONEYDA PEREZ as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTV GROUP HOLDINGS, LLC, a Delaware Corporation, LONSTEIN LAW OFFICES, P.C., a New York Professional Corporation; SIGNAL AUDITING, INC., a New York Corporation, JULIE COHEN LONSTEIN and WAYNE M. LONSTEIN,<br><br>Defendants. | Case No. 8:16-CV-01440-JLS-DFM<br><br>**DECLARATION OF MARLYS NISSEN IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:    August 19, 2022<br>Time:    10:30 a.m.<br>Dept.:   8A<br><br>Fourth Amended Complaint Filed: December 17, 2020 |

# DECLARATION OF MARLYS NISSEN

I, Marlys Nissen hereby declare as follows:

1. This Declaration is based on my personal knowledge. I am over the age of 18 years old, and if called as a witness, I would and could completely testify to these facts.

2. In 2001 my husband Danny and I moved Mo's One More Lounge, a bar/restaurant previously located in Evansdale, Iowa to 4515 East Washburn Road, Washburn, Iowa. We have owned and operated Mo's continuously at that location since that time.

3. In late April 2006 a local man named Marvin came into the bar and told me we could get DIRECTV services in both our business and in our home on a new promotion because DIRECTV was trying to get customers away from Mediacom. I told Marvin I did not know him and wanted to verify what he was telling me. He asked if it would help if his boss paid me a visit. I said yes. A few days later, Dean Cox, a customer of our previous establishment and Marvin's boss, came to the bar and confirmed that DIRECTV was running a "package" deal in the area. I believed Marvin to be authorized to sell and install DIRECTV services.

4. I agreed to the proposed package and Dean returned with an installer a week or so later. They installed DIRECTV services in the business first and then went to our home and installed the services there. They installed satellite dishes in both locations. The billing was set up to go to the house although I do not recall being asked which address to use. It is obvious to the installer that the services would be broadcast in my business and the DIRECTV representative installed the services in my business.

5. Sometime after May 17, 2013 my husband and I received a letter from the Lonstein Law Office ("LLO") accusing us of violating the "Federal Communications Act" and "DIRECTV customer agreements." Around that same time all of our DIRECTV services were shut off. I called LLO and asked why our services had been shut off and all the woman would tell me is that we were violating

the law because we had a residential account in our business. I explained to the woman that a DIRECTV representative came to our business and promised us a package deal and that DIRECTV should have warned us this was a problem before disconnecting the services. I explained that my husband and I own a small business in a small town and do not make much money. The woman told me that I had to pay $8,000 with a $2,500 down payment and 6 payments of about $1,000 each. I was so upset and started crying. I explained that we do not have that kind of money and against told her DIRECTV had done the installation in the business and in our home. The woman responded by offered to accept $8,000 with an initial payment of $2,500 and 8 payments of $700. I did not agree and again told her I could not come up with that kind of money.

6. A number of months later, on or about October 24, 2013, someone from LLO called to ask about a "past due payment." I had no idea what she was talking about and again explained to the woman what I told the previous person I spoke with months ago – that DIRECTV presented us with a deal and we agreed to the deal and that they installed the service in our business. The woman threatened to sue us and suggested I talk to an attorney.

7. In February 2015 we were served with a summons and complaint. My husband and I were scared to death and found a local attorney who was willing to represent us for an hourly rate and did not require an up-front retainer. After a few weeks of negotiations, our attorney advised us that LLO's last and final offer was for us to pay $7,500, a $2,000 initial payment and the remaining $5,500 in $500 monthly installments and agree to become a DIRECTV commercial subscriber. We had to borrow the money to pay the initial payment of $2,000. LLO also demanded a consent order and judgment in the amount of $15,000. My understanding was if we missed any payments, LLO could enforce the judgment against us for $15,000. My husband and I refused to become DIRECTV commercial subscribers as we were both incredibly angry. We would have fought this lawsuit except our lawyer told us

1. it would cost us more money to defend the case than to settle. Our legal fees in this matter were somewhere around $2000.00.

8. My husband and I know that we did not do anything wrong. We feel like we were tricked and lied to by the DIRECTV representative and then forced to pay DIRECTV and its attorneys' money.

9. I believe DIRECTV has utilized this scheme of soliciting services and later claiming the services to be used illegally for the purpose of extorting money from small businesses like ours who lack the means to defend themselves and are scared to risk an unfavorable judgment. My husband and I would have preferred to fight the case, but we could not afford the legal fees necessary to do so.

10. Even before I was named as a Class Representative I made myself available to class counsel at their request. Danny and I both met with attorney Lisa Clay several times in person. After we signed on as representatives I spent a significant number of hours searching for and reviewing documents in our possession and reviewing them with my husband and the attorneys. I also spent time reviewing documents produced by Defendants and discussing them with my attorneys. I participated in many telephone calls with my attorneys, reviewed discovery related to documents in my possession and many calls discussing the mediation and settlement in this matter. I estimate that I personally spent 50-60 hours actively pursuing and assisting my attorneys in this litigation. This was time taken away from my business and clients.

11. When I agreed to become a Class Representative, I understood that I have a fiduciary duty to the class to act on their behalf and not in my own interests. I further understood that I would be required to actively participate in the litigation and I have maintained regular communication with my attorneys and have assisted when asked. I knew and appreciated the risk I was taking in agreeing to become a class representative in this case. I appreciated that Defendants were vigorously defending the action and knew my business might be subjected to investigation and scrutiny. I knew I would be required to sit through days of deposition and would be

required to devote a significant amount of time to the litigation. I further knew the risk of potentially being liable for litigation costs associated with defending the case in the event a judgment was awarded to Defendants. I took those risks willingly to secure recovery for the class. I also understand that DIRECTV was seeking to have my claim and Class Representative status dismissed when the parties began settlement discussions. I understand that if my claims had been dismissed, I would not likely receive anything for the efforts I undertook as a Class Representative.

12.  During settlement negotiations I understood the risks of moving forward with further class certification efforts and potential trial. Since the settlement negotiations lasted over a year, I maintained regular contact with my attorneys during this time to receive updates on the negotiations and status of the case. Based on the substantial information provided and conversations with my attorneys, I believe the pending settlement terms are fair, reasonable, adequate and in the best interests of the class.

13.  I understand that this declaration is submitted in support of this court's consideration of Plaintiffs' Motion for Approval of the Settlement. I have reviewed the terms of the Settlement and discussed them with Ms. Clay. I support this Settlement and believe it provides a reasonable recovery for the class members.

14.  I understand that as part of the Settlement, a request will be made on my behalf for a service/incentive award in the amount of $10,000.00. I understand that I am not guaranteed this payment and that it must be approved by the Court. When I agreed to become a class representative no one promised me any additional payment or discussed with me any certain amount and it has been made clear to me such request must be approved by the Court. I believe in light of the foregoing that this request is reasonable.

15.  While I did not type this declaration, a copy was provided to me before I signed and I was given the opportunity to make changes. The language of the

- 4 -

DECLARATION OF MARLYS NISSEN

declaration has been drafted by one of my attorneys based on my verbal statements. I adopt this declaration as my own statement.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated this 19 day of March, 2022 at Waterloo, Iowa.

_____
Marlys Nissen